UNITED STATES of America, Appellant,

v.

Webster L. HUBBELL, Suzanna W. Hubbell, Michael C. Schaufele and Charles C. Owen, Appellees.

No. 98–3080.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1998.

Decided Jan. 26, 1999.

Kenneth W. Starr, Independent Counsel, argued the cause for appellant. With him on the briefs were David G. Barger, Joseph M. Ditkoff, and Darrell M. Joseph, Associate Independent Counsels. Stephen J. Binhak, Associate Independent Counsel, entered an appearance.

John W. Nields, Jr. argued the cause for appellees Webster L. Hubbell and Suzanna W. Hubbell. K. Chris Todd argued the cause for appellee Michael C. Schaufele. With them on the brief were Laura S. Shores, Wan J. Kim and Drake Mann, counsel for appellee Charles C. Owen.

J. Douglas Wilson, Attorney, U.S. Department of Justice, argued the cause for amicus curiae United States acting through the Attorney General.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed PER CURIAM.*

Separate opinion concurring in Part I filed by Circuit Judge WALD.

Separate opinion dissenting from Part I filed by Circuit Judge TATEL.

Separate opinion dissenting from Part II filed by Circuit Judge WILLIAMS.

PER CURIAM:

All defendants—Webster L. and Suzanna W. Hubbell, Michael C. Schaufele, and Charles C. Owen—moved in the district court to dismiss an indictment charging tax evasion and related crimes on the ground that the indictment was beyond the prosecutorial jurisdiction of Independent Counsel Kenneth W. Starr. In addition, Webster Hubbell moved for dismissal on the theory that prosecution necessarily would depend on evidence produced under compulsion and used in violation of the Fifth Amendment and the immunity granted him under 18 U.S.C. § 6002. The court granted both motions. 11 F.Supp.2d 25 (D.D.C.1998). We reverse both decisions and remand for proceedings consistent with this opinion.

## I. JURISDICTION

On August 5, 1994 this court's Special Division for the Purpose of Appointing Independent Counsels ("Special Division"), upon request from the Attorney General, appointed Kenneth W. Starr as Independent Counsel. It gave Independent Counsel Starr jurisdiction to investigate

whether any individuals or entities have committed a violation of any federal criminal law, other than a Class B or C misdemeanor or infraction, relating in any way to James B. McDougal's, President Wil-

---

* Judge Williams wrote Part I; Judge Wald wrote Part II.

liam Jefferson Clinton's, or Mrs. Hillary Rodham Clinton's relationships with Madison Guaranty Savings & Loan Association, Whitewater Development Corporation, or Capital Management Services, Inc.

as well as

other allegations or evidence of violation of any federal criminal law, other than a Class B or C misdemeanor or infraction, by any person or entity developed during the Independent Counsel's investigation referred to above and connected with or arising out of that investigation

and, more specifically,

any violation of 28 U.S.C. § 1826, or any obstruction of the due administration of justice, or any material false testimony or statement in violation of federal criminal law, in connection with any investigation of the matters described above.

The Special Division also gave the Independent Counsel jurisdiction to seek indictments against and to prosecute

any persons or entities involved in any of the matters described above, who are reasonably believed to have committed a violation of any federal criminal law arising out of such matters, including persons or entities who have engaged in an unlawful conspiracy or who have aided or abetted any federal offense.

Finally, apparently summarizing the above grants, the Special Division ordered that the Independent Counsel have

prosecutorial jurisdiction to fully investigate and prosecute the subject matter with respect to which the Attorney General requested the appointment of independent counsel, as hereinbefore set forth, and all matters and individuals whose acts may be related to that subject matter, inclusive of authority to investigate and prosecute federal crimes (other than those classified as Class B or C misdemeanors or infractions)

that may arise out of the above described matter, including perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses.

These grants of authority were under 28 U.S.C. § 593(b)(1), a provision of the Ethics in Government Act, which calls on the Special Division, on application of the Attorney General, to "appoint an appropriate independent counsel and ... define that independent counsel's prosecutorial jurisdiction." Besides that authority—and authority to expand an independent counsel's jurisdiction on application of the Attorney General, see *id.*; see also *id.* at § 592(c)(2) (directing Attorney General to follow same procedure as to new information)—the Act authorizes an independent counsel to ask the Special Division to "refer" to him "matters related to the independent counsel's prosecutorial jurisdiction." 28 U.S.C. § 594(e). As a result of such a request, the Special Division on September 1, 1994 made a referral of matters concerning Webster L. Hubbell's billing and expense practices while a member of the Rose Law Firm. Hubbell pled guilty to two felony counts concerning these matters in October of that year; in the plea agreement Hubbell promised to cooperate "by providing full, complete, accurate and truthful information" to the Independent Counsel about Madison, Whitewater, and Capital Management (hereinafter collectively "Whitewater").

The Independent Counsel discovered in 1996 that Hubbell apparently had begun to receive substantial payments as consulting fees in 1994. According to the present indictment, these payments included $100,000 from Hong Kong China Limited (controlled by the Riady family through the Lippo Group) and $62,775 from Revlon.[1] Not satisfied that Hubbell had been fully cooperating, the Independent Counsel sought, as he says in his brief, "to determine whether a relation-

---

1. The relationship between these entities and potential targets of the Whitewater investigation should now be familiar. The Riady family knew and supported President Clinton from the 1980s, and contributed large sums to the Democratic National Committee in the 1990s. See generally House Gov't Reform and Oversight Comm., 105th Cong., Campaign Finance Investigation Interim Report Chapter 4, Part A (1998). Secret Service records indicate that James Riady had made several visits to the White House in the days before the payment to Hubbell was made. See *id.* at 14 n. 94. As for Revlon, it later accommodated another potential witness in a different litigation involving possible targets of the Whitewater investigation by offering her a job.

ship existed between those payments and Mr. Hubbell's testimony with respect to Whitewater and Madison-related matters."

After the investigation had progressed considerably, the Independent Counsel sought another § 594(e) referral from the Special Division. It granted the referral on January 6, 1998, encompassing prosecutorial jurisdiction over:

> (i) whether Webster L. Hubbell or any individual or entity violated any criminal law, including but not limited to criminal tax violations and mail and wire fraud, regarding Mr. Hubbell's income since January 1, 1994, and his tax and other debts to the United States, the State of Arkansas, the District of Columbia, the Rose Law Firm, and others; and

> (ii) whether Webster L. Hubbell or any individual or entity violated any criminal law, including but not limited to obstruction of justice, perjury, false statements, and mail and wire fraud, related to payments that Mr. Hubbell has received from various individuals and entities since January 1, 1994.

A federal grand jury indicted Hubbell and the other defendants on April 30, 1998. The indictment alleged conspiracy, mail and wire fraud, and various tax offenses, all concerning attempts to keep Hubbell's income—including, in material part, the consulting fees—from creditors and the IRS.

On July 1, 1998 the district court granted defendants' motion to dismiss the indictment in its entirety as beyond the authority of the Independent Counsel. 11 F.Supp.2d at 27.

\* \* \*

The threshold issue before us is the effect, if any, of the Special Division's January 6, 1998 referral order ("the referral"). The Independent Counsel argues that the referral is either unreviewable or is entitled to deference from this court; defendants—and the Department of Justice in its amicus brief—argue that it is irrelevant. No one suggests that the indictment is beyond the scope of the referral.

■ Referrals from the Special Division are authorized by 28 U.S.C. § 594(e), which provides: "An independent counsel may ask the Attorney General or the division of the court to refer to the independent counsel matters related to the independent counsel's prosecutorial jurisdiction, and the Attorney General or the division of the court, as the case may be, may refer such matters." The Supreme Court said in *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), that "this provision does not empower the court to expand the original scope of the counsel's jurisdiction ... [but] simply to refer matters that are 'relate[d] to the independent counsel's prosecutorial jurisdiction' as already defined." *Id.* at 680 n. 18, 108 S.Ct. 2597.

The referral here, then, is simply an explicit determination by the Special Division that the original grant of jurisdiction implicitly included the matters referred. See *In re Espy,* 80 F.3d 501, 507 (D.C.Cir.1996); see also *Morrison,* 487 U.S. at 685 n. 22, 108 S.Ct. 2597. The Independent Counsel argues for unreviewability of this determination by analogy to what he regards as comparable decisions of the Attorney General. For such unreviewable counterparts he points first to the decisions of the Attorney General and her subordinates to have "Main Justice" prosecute certain cases rather than a local U.S. Attorney's Office and second to the Attorney General's own referral authority under § 594(e). In *United States v. Tucker,* 78 F.3d 1313 (8th Cir.1996), the Eighth Circuit found the latter unreviewable, relying in part on the analogy to the Main Justice/U.S. Attorney allocation.

At least as applied to the Special Division, however, the analogy does not hold. Although the Supreme Court upheld the independent counsel provisions of the Ethics in Government Act against constitutional challenge in *Morrison v. Olson,* the Court, in rejecting the attack on the statute's grant of powers to the Special Division, saw it as important to say that the § 594(e) power did not empower the Division to expand the original grant of jurisdiction. 487 U.S. at 680 n. 18, 108 S.Ct. 2597. If the constitutional balance between the branches requires this constricted reading of § 594(e), it would be startling (though not inconceivable) to find that

Article III courts are powerless to enforce the boundary. No such issues are at stake in the parceling out of jurisdiction between Main Justice and the various U.S. Attorneys' offices. And *Tucker* itself poses somewhat different issues, as there the executive branch—the one most jeopardized by the independent counsel provisions—is the one exercising the § 594(e) power. In *Tucker*, moreover, the Eighth Circuit also relied upon particular legislative history indicating that Congress intended the Attorney General's § 594(e) referrals to be unreviewable, see 78 F.3d at 1317–18, history not paralleled as to § 594(e) referrals by the Special Division. We therefore find nothing that overcomes the general presumption of reviewability.

But the independent counsel alternatively asks for deference to the Special Division's § 594(e) referral. We initially observe that it is not clear in what constitutional capacity the Special Division acts in making a referral. The Independent Counsel and the Department of Justice as amicus see referrals as some sort of agency action; defendants, like the district court, appear to leave open the possibility that the proper analogy is to various other ancillary functions performed by the judiciary—authorizing search warrants, for example.[2] 11 F.Supp.2d at 30–31. Both analogies seem fairly (though not entirely) apt—as one might expect for a constitutional hybrid—but they lead us to the same result: substantial deference.

Viewed as an agency, the Special Division appears to act quite like one glossing its own regulation—a situation in which we usually grant substantial deference. See *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 584 (D.C.Cir.1997) (deference to agency interpreting its own regulations at least equal to deference under *Chevron*). Defendants and the Department of Justice as amicus would have us reject deference on the ground that the Division operates without procedures for critique and comment by outsiders, especially by adversely affected parties. But the cases frequently find deference in such safeguard-deprived circumstances.

See, e.g., *Stinson v. United States*, 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (commentary to sentencing guidelines); *Consolidation Coal Co. v. Federal Mine Safety and Health Review Comm'n*, 136 F.3d 819 (D.C.Cir.1998) (interpretation implicit in Commission's decision to bring enforcement action); *National Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129 (D.C.Cir.1997) (litigating position, as long as it is agency's actual and deliberated-upon view); *Paralyzed Veterans*, 117 F.3d at 581–82 (supplement to DOJ's ADA Title III Technical Assistance Manual).

The Department of Justice goes on to characterize its chief, the Attorney General, as the entity actually responsible for the initial grant; from that assumption it reasons that Congress likely intended no deference for the Special Division's interpretations of the initial § 593 grant (which is all that § 594(e) referrals are). See *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 158, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (Congress may divide various powers as it wishes, subject to broader constitutional limitations). But the fact that the Attorney General initiates the appointment process and makes an initial suggestion of jurisdiction cannot be a basis for withholding deference to the Special Division: in the end, the order appointing the Independent Counsel and setting out his jurisdiction is articulated and issued by the Special Division as its own action. See 28 U.S.C. § 593(b)(1); *Paralyzed Veterans*, 117 F.3d at 585 (identity of actual regulation-drafter irrelevant once regulation is "put out by [the latter agency] as its own"). We therefore presume that the Special Division's interpretations receive deference, see *Martin*, 499 U.S. at 151, 111 S.Ct. 1171 ("[W]e presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers."), and we find no intent to overcome that presumption.

*Morrison*, it is true, requires that "the jurisdiction that the [Special Division] decides upon must be demonstrably related to the factual circumstances that gave rise to

---

2. Although an argument that the Special Division's interpretation of the original grant's legal language is judicial action and presumptively

unreviewable as law of the case could be at least facially plausible, see, e.g., *Espy*, 80 F.3d at 507, no party has taken such a position here.

the Attorney General's investigation and request for the appointment of the independent counsel in the particular case." 487 U.S. at 679, 108 S.Ct. 2597. This sets out the constitutional boundary for the Special Division's initial action. Even if we assume its extension to the Division's later § 594(e) interpretation of that grant, nothing helpful to the Department's or defendants' position would follow. It would be a curious revival of the discredited doctrines of "constitutional fact" and "jurisdictional fact" to infer from the constitutionality of the boundary that an Article III court (as such) must draw it de novo. See John Dickinson, "*Crowell v. Benson*: Judicial Review of Administrative Determinations of Questions of 'Constitutional Fact,'" 80 U. Pa. L.Rev. 1055, 1072–75, 1077–79 (1932) (explaining logical errors in doctrine now generally regarded as moribund);[3] see also *Oklahoma Natural Gas Co. v. FERC*, 28 F.3d 1281, 1283–84 (D.C.Cir.1994) (*Chevron* deference applicable even to questions of agency jurisdiction and preemption of state power). There is no claim by defendants, moreover, that if the disputed referral is within the original grant, it would follow that the original grant was ipso facto outside the zone within which it was required to fall, i.e., "demonstrably related" to the Attorney General's request.

Defendants stress additional language in *Morrison* that, they claim, characterizes the referral power of the Special Division as "essentially ministerial." 487 U.S. at 681, 108 S.Ct. 2597. This simply misreads the case—the language specifically refers to the provisions listed in its footnote 19: referral is not among them.

The existence of alternative referring agencies, the Attorney General and the Special Division, presents further deference problems. Compare, e.g., *Rapaport v. OTS*, 59 F.3d 212, 216–17 (D.C.Cir.1995) (no deference in *Chevron* context if more than one agency given authority) with *id.* at 220–22 (Rogers, J., concurring in the judgment) (case-by-case determination of deference in such situations). Is a referral by the Attorney General also entitled to deference? We have seen that she would not be interpreting her *own* grant of jurisdiction—the key issue under *Martin*—but we do not rule out other possible grounds for deference or even unreviewability. See, e.g., *Tucker*, 78 F.3d at 1317–19 (legislative history indicates that referrals from Attorney General are not reviewable). Indeed, as *Morrison*'s concern about the Special Division's power is far less applicable to a § 594(e) reference by the Attorney General (who would be voluntarily ceding her own power), her power here may not be limited to interpreting the original grant; any review of her referral would then be in an entirely different context. As either entity may act under § 594(e) only at the initiative of the Independent Counsel,[4] the possibility of conflicting interpretations is one that the Independent Counsel can freely prevent. Further, a grant by one authority and denial by the other need not necessarily constitute a conflict: the phrase "may refer" appears to include some discretion to decline referral even where the authority agrees with the proposed interpretation of the initial

---

**3.** In Dickinson's analysis the key error is to suppose, of a fact that is said to be a necessary basis of jurisdiction or of constitutionality, (1) that it may be known absolutely and (2) that only judicial apprehension of the fact can constitute that knowledge. See *id.* at 1074. Indeed, as almost any issue could be characterized as a jurisdictional or constitutional one, this sort of reasoning would swallow deference whole. See *id.* at 1077–79; see also *Mississippi Power & Light Co. v. Mississippi* ex rel. *Moore*, 487 U.S. 354, 381, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring) ("To exceed authorized application is to exceed authority. Virtually any administrative action can be characterized as either the one or the other, depending upon how generally one wishes to describe the 'authority.'").

**4.** The statute also says that the Attorney General may refer a matter "on the Attorney General's own initiative," but then provides that the Independent Counsel "may accept such referral if the matter relates to the independent counsel's prosecutorial jurisdiction," 28 U.S.C. § 594(e), so that in this context the independent counsel himself can unilaterally moot the relatedness issue by deciding not to proceed.

We note further that the Attorney General has taken no action under § 594(e) in this case. The Independent Counsel did not ask her for a referral of the contested matters until October 9 of this year—well after the Special Division had already granted its referral—and she has not yet acted.

jurisdictional grant. Indeed, this apparent discretion suggests the possibility—on which we express no opinion—that Congress intended only a *grant* of referral to be authoritative.

Finally, the claim of zero deference would if accepted render § 594(e)'s provision for referral by the Special Division meaningless. We do not believe Congress enacted this statutory procedure simply to relieve the solitude of the Independent Counsel's office.

The search warrant analogy—brought to mind by the defendants' and the Department's stress on the absence of adversary procedures—is also instructive. Although made ex parte and resolving constitutional questions, a determination of probable cause by a federal magistrate or state judge is given "great deference." *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation omitted). And in this context it is quite plain that neither the allocation of the power to an array of entities nor the possibility of denial by one judge before a grant by another stands in the way of deference to any particular warrant actually granted.

Both analyses lead us to deference, but employ different linguistic formulations. An agency's interpretation of its own regulation is upheld unless "plainly erroneous or inconsistent" with the regulation, *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), while a search warrant is valid if the magistrate had a "substantial basis" for his finding of conformity to the applicable standard (probable cause). *Gates,* 462 U.S. at 238, 103 S.Ct. 2317. Such formulations do not necessarily conflict: each appears to assume a paradigm case rather different from the Special Division's § 594(e) referral.

Although deference to an agency's interpretation of its regulations applies where it is simply applying the regulation to a specific set of facts, see, e.g., *Consolidation Coal Co.,* 136 F.3d at 820–21, the deference is plainly focused on the agency's norm-defining role.

It makes sense to view the referral power thus, at least in part. Unlike a magistrate issuing a warrant, for example, the Special Division is not interpreting a single concept with an elaborate precedential pedigree and fairly well-established outline: even key terms (such as "related to") are, as terms of art go, still novel and quite ambiguous. Further, just as it is far easier for an agency to develop and maintain a coherent interpretive line if its legal interpretations enjoy deference from the scattered multitude of judges who review its decisions, see Peter L. Strauss, "One Hundred Fifty Cases Per Year," 87 Colum. L.Rev. 1093 (1987) (arguing that this value supports the principle of *Chevron* deference to agency interpretation of statutes), so deference may enable the Special Division to do so, as the thousands of magistrates and state judges who issue warrants obviously cannot.

On the other hand, to the extent these recurring concepts are fleshed out, the grant of referral also entails some of the marshaling and application of facts (or factual assertions) that "substantial basis" seems to assume and "plainly incorrect or inconsistent" may overlook. In fact, this element and the norm-defining element discussed above appear inextricably entwined in the Special Division's referral decision.

We could perhaps attempt to articulate some multiheaded standard to govern review of the referral. But this would be a futile exercise of judicial ingenuity. As Judge Posner has noted, there is deference and non-deference, but further multiplication of flavors "reflects the lawyer's exaggerated faith in the Word." *United States v. McKinney,* 919 F.2d 405, 422 (7th Cir.1990) (Posner, J., concurring); see also *NLRB v. Universal Camera Corp.,* 179 F.2d 749, 753 (2d Cir. 1950) (L. Hand, C.J.), *vacated,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). That is to say, we believe that a § 594(e) referral from the Special Division falls into the "deference" category. The common thread of deference formulations being reasonableness, see *McKinney,* 919 F.2d at 423,[5] we believe that

---

5. More specifically, we have said that "we very much doubt that we would defer to an *unreasonable* agency interpretation of an ambiguous regu-

lation." *Paralyzed Veterans,* 117 F.3d at 584 (emphasis in original). Further, although "substantial basis" has not received much specific

the Special Division's decision to refer must be upheld if reasonable and rejected if not.

\* \* \*

■ ■ The statute sets a minimum on the scope of the jurisdiction the Special Division is to grant. We do not think the Special Division's referral is unreasonable even if compared to this minimum. Indeed, we find the indictments themselves within the statutory minimum jurisdiction even without deference to the referral.

The statute begins by directing the Special Division to "assure that the independent counsel has adequate authority to fully investigate and prosecute *the subject matter* with respect to which the Attorney General has requested the appointment of the independent counsel, and *all matters related to that subject matter*." 28 U.S.C. § 593(b)(3) (emphasis added). As we shall see, there is an ambiguity in the definition of that core "subject matter," but, under the sentence as a whole, the Independent Counsel may prosecute anything "related to" it.

The statute continues:

Such jurisdiction shall also include the authority to investigate and prosecute Federal crimes ... that may arise out of the investigation or prosecution of the matter with respect to which the Attorney General's request was made, including perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses.

*Id.* The Independent Counsel may therefore also prosecute crimes that "arise out of the investigation or prosecution of" the core "subject matter."

As we noted, there is an ambiguity in just what the *core* jurisdiction is. The Attorney General's initial application to the Special Division described the subject matter of the appointment as "whether any violations of federal criminal law were committed by James B. McDougal or any other individual or entity *relating to* Madison Guaranty Savings & Loan Association, Whitewater Development Corporation, or Capital Management Services, Inc." Application for the Appointment of Independent Counsel (1994) (emphasis added). It appears unusual in defining the original "core" as criminal activity "relating to" the narrowly conceived subject— Whitewater.[6] One could argue that the "related to" phrases compound: the Independent Counsel would thus be entitled to investigate and prosecute crimes "related to" any crimes "relating to" Whitewater (or, under the second statutory sentence, "aris[ing] out of the investigation" of crimes "relating to" Whitewater).

We think in fact such piling on adds little. "Relating to" and "arise out of" are themselves such amorphous phrases as to make their addition (or multiplication) virtually meaningless.

Rather we think the minimum statutory space must be read, as we have said in the past, in accord with the purposes of the statute. Its "central purpose ... is to permit the *effective* investigation and prosecution of high level government and campaign officials." *United States v. Wilson*, 26 F.3d 142, 148 (D.C.Cir.1994) (emphasis added). Discussing the "related to" language of § 593(b)(3), we noted that "the scope of a special prosecutor's investigatory jurisdiction can be both wide in perimeter and fuzzy at the borders." *Id.* The word "relation" thus comprises more than identical twins. And just as a person is "related" not only to his parents and children, but to grandchildren

elaboration, the Supreme Court also formulated the test as "substantial evidence," *Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), which of course simply refers us to the position of a "reasonable factfinder," *Allentown Mack Sales and Service v. NLRB,* 522 U.S. 359, 377, 118 S.Ct. 818, 828, 139 L.Ed.2d 797 (1998).

**6.** Both the former Special Prosecutor's core jurisdiction and the Attorney General's suggested core jurisdiction for the Independent Counsel— which the Special Division adopted as the first jurisdictional clause of its original grant— tracked this expansive version of "subject matter." See Application for the Appointment of Independent Counsel, (Suggested) Statement of Jurisdiction of Independent Counsel ("whether any individuals or entities have committed a violation of any federal criminal law ... *relating in any way* to James B. McDougal's, President William Jefferson Clinton's, or Mrs. Hillary Rodham Clinton's relationships with" Whitewater) (emphasis added).

and grandparents,[7] the fact that a crime is in some sense a verbal step or two away from the *core* crime cannot render it *unrelated.*

More concretely, the jurisdiction to look into matters "related to" the core areas of initial inquiry must allow the Independent Counsel enough leeway to investigate and prosecute such matters as are appropriate for him to effectively carry out his mandate. We think such effectiveness cannot be secured unless the Independent Counsel is at least able to pursue crimes ancillary to the commission or concealment of crimes in the core area.

The rationale for jurisdiction in this case is the same under either the "related to" or "arising out of" phrases in the statute. If payments Hubbell received beginning in 1994 were indeed hush money to secure Hubbell's silence vis-à-vis Whitewater, the possible obstruction of justice therein would certainly be a crime "relating to" Whitewater, for it would be an attempt to cover up the wrongdoing afterward. Both the Department of Justice and the defendants admit as much. They nevertheless argue that the tax charges here, as well as wire fraud and mail fraud aimed at keeping the income from the IRS and others *who would have resulting claims,* are not like the "arising out of" crimes specified in § 593(b)(3): "perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses." The latter, argues DOJ, involve "conduct tending to impede the investigation and prosecution of *other* crimes." DOJ Amicus Br. at 34. But *any* criminal conduct that could hide the hush money or amplify its value tends to impede investigation and prosecution of the matter being hushed up. The

less disclosure of the payments, the less chance that they and their nature will come to light; and the more value Hubbell can squeeze from hush money (by nonpayment of taxes or the like), the more chance it will succeed in preventing his cooperation.[8]

The dissent, disputing these concerns, first argues that the Riady and Revlon payments were in fact disclosed in Hubbell's 1994 tax return. See Dissent at 593. This appears correct. But it does not seem unreasonable to believe that the other, unenumerated, "consulting fee" payments—made that year and after—were of a piece with the specifically detailed ones.[9] Further, the dissent's apparent belief that no one "could have foreseen" Hubbell's tax evasion scheme, Dissent at 594, is hard to grasp. Surely Hubbell could have anticipated the advantages of sheltering any hush money from the IRS. And at every point where he faced a choice (presumably continuously), he could weigh the benefits of remaining silent with those of speaking up. Tax evasion, both in anticipation and execution, would amplify the expected benefits of silence and thereby increase the chances that the underlying truth—if in fact something was hidden—would remain buried.

Indeed, the history of "aris[ing] out of" indicates a rather liberal view as to the prosecution of downstream matters. The Watergate Special Prosecutor, acting under jurisdiction granted by regulation to pursue offenses "arising out of" the Watergate burglary or "offenses arising out of the 1972 Presidential Election for which the Special Prosecutor deems it necessary and appropriate to assume responsibility,"[10] obtained con-

---

7. We do not, however, express an opinion on the applicability of this metaphor beyond the second generation.

8. We note that the Independent Counsel, apparently focused on the particular procedural implications of "arise out of," did not fully articulate in the district court his theory of the tax violations as themselves reinforcing the cover-up.

9. We also realize that not all the tax violations may specifically concern the possible hush money payments—that is, the "consulting fees." It would be ludicrous, however, if the Independent Counsel, in bringing a nondisclosure and evasion case materially concerning such payments, were

not able to present the full pattern of nondisclosure and evasion.

10. The mandate, in full, stated that:

The Special Prosecutor shall have full authority for investigating and prosecuting offenses against the United States arising out of the unauthorized entry into Democratic National Committee Headquarters at the Watergate, all offenses arising out of the 1972 Presidential Election for which the Special Prosecutor deems it necessary and appropriate to assume responsibility, allegations involving the President, members of the White House staff, or Presidential appointees, and any other matters

victions of H.R. Haldeman, John D. Ehrlichman, and John N. Mitchell for their actions in attempting to *conceal* a *cover-up*, i.e., to cover-up a cover-up—specifically, for perjury in making false denials of their efforts to cover up the Watergate break-in (one such effort being hush money payments to the burglars and E. Howard Hunt, Jr.). See *United States v. Haldeman*, 559 F.2d 31, 59 (D.C.Cir.1976). Though the language is different, we find it implausible that Congress intended to give the Independent Counsel a narrower jurisdiction than was exercised by that office's most salient model.

The defense, of course, argues that we cannot consider the hush money hypothesis at all. Unlike Watergate, the prosecutor has not yet charged anyone named in this indictment with the suggested first-level obstruction of justice. Seeming to regard non-indictment as the equivalent of true and complete exoneration (i.e., better than acquittal, which is consistent with a case from which the jury could have found guilt), defendants effectively claim that unless the bridge crime is charged (i.e., the obstruction of justice which is invoked by the Independent Counsel), and presumably then proven at least in the sense of a case on which reasonable jurors could find guilt, it must be assumed completely non-existent.

This requires too much. It is true that if the Independent Counsel had no evidentiary grounds at all for believing that the payments were obstructive—or, indeed, if the evidence clearly showed that the payments were *not* obstructive—he could not rely on such a jurisdictional theory. But defendants' claim is implausible. The Department of Justice itself has recognized that prosecution of a pure non-disclosure crime is suitable when it lacks enough evidence to prosecute. Its Manual, for example, allows prosecutors to use 18 U.S.C. § 1001 (prohibiting false statements) to pursue public corruption crimes when prosecution for the underlying offense "is not practicable." 9A DOJ Manual at 9–1938.123 (1988); see also *United States v. Blackley*, 167 F.3d 543, 548 (D.C.Cir.1999). It even directs prosecutors

to make their decisions based on the nature (in this case, the gravity) of this uncharged underlying offense: "It is DOJ policy not to prosecute . . . under section 1001 *unless* the nondisclosure conceals significant underlying wrongdoing." 9A DOJ Manual at 9–1938.123 (emphasis in original). Perhaps even more tellingly, the Internal Revenue Service has established a substantial "Special Enforcement Program" to investigate people who "derive substantial income from illegal activities," IRS Manual § 4566.1(1), presumably on the assumption that in the case of many criminals (Al Capone being the most notorious example) it is easier to indict and convict them for the nonreporting and concealment of their illegal income than on the illegality of the income-generating activities. The IRS Manual goes on to explain that a person may be targeted for Special Enforcement (and thus for a tax case driven by his possible involvement in *other* criminality) if he "is reasonably believed to be receiving substantial income from an illegal activity that is separate and apart from the alleged tax violations." *Id.* § 4566.1(2)(d). For certain underlying crimes, the Manual states a laxer standard. For the category "IRS racketeer," for example, all that is required is that he be "identified" by a specified high IRS official "as being engaged in organized criminal activities; notorious or powerful with respect to local criminal activities," etc. *Id.* § 4566.1(2)(a).

That does not mean, of course, that the Independent Counsel is bound by the specific provisions of various executive branch manuals. The dissent faults the Independent Counsel for failure to comply with a provision of the DOJ Manual requiring IRS approval as a predicate to tax cases. See Dissent at 596. The dissent rests this complaint on § 594(f)(1), which requires the Independent Counsel to follow DOJ policy *except* where "to do so would be inconsistent with the purposes of this chapter." 28 U.S.C. § 594(f)(1). It suggests that the court wrongly "assume[s]" such inconsistency. Dissent at 596. But defendants have never

---

which he consents to have assigned to him by the Attorney General.

38 Fed.Reg. 30,738–39 (1973).

raised a claim under § 594(f)(1). In the absence of any effort to assert the section (and thus any opportunity for the Independent Counsel to defend himself), an inference that its exception applies seems fairly grounded: very little independence would be left in the office if the Independent Counsel had to run to DOJ or other executive branch agencies whenever DOJ established such sign-off procedures.[11]

Thus, while the Independent Counsel is differently situated, other agencies' views on the links between crimes provide useful guidance. It is unreasonable that the Independent Counsel should be hamstrung by the need to prove every proposition necessary for jurisdiction by the exacting standards suggested by the defense. If he were, even his *investigations* would be severely limited, for the statute gives no linguistic hook for requiring a lower standard of proof for investigatory jurisdiction. Furthermore he, unlike every other prosecutor, would be unable to use a prosecution of an easily proved derivative offense as a substitute for prosecution of another, hard-to-prove offense. For the Independent Counsel, a reasonable belief that the linking crime has been committed should suffice.

We are not confronted here with a situation where the money at issue is clearly untainted by possible underlying obstruction. The timing, sources, and extent of the payments make the belief that they were hush money reasonable. That suffices.

\* \* \*

The Supreme Court upheld the constitutionality of Congress's independent counsel arrangements in *Morrison v. Olson*. It is not for lower court judges to undercut that decision by constructions of the Act that prevent this Independent Counsel from performing his duty in a manner reasonably approximating that of an ordinary prosecutor.

11. As *Morrison* was decided before the "inconsistent with the purposes of this chapter" language was added to § 594(f)(1), see Pub.L. No. 103–270, § 3(e)(1), 108 Stat. 734 (1994), the dissent's reference to the case, see Dissent at 596, is puzzling. Absent a claim that the new exception

## II. IMMUNITY

Webster Hubbell invoked his Fifth Amendment privilege against self-incrimination in response to a broad-reaching subpoena *duces tecum* issued by the Office of the Independent Counsel (the "Independent Counsel" or the "government"). He delivered the specified documents only after the Independent Counsel had obtained a grant of use-immunity pursuant to 18 U.S.C. §§ 6002, 6003. Within the personal and financial records he produced, the government found evidence which provided the keystone for a ten-count indictment. Issued by a federal grand jury on April 30, 1998, the indictment alleged that Webster Hubbell, together with his wife Suzanna Hubbell, his tax lawyer Charles Owen and his accountant Michael Schaufele, had committed various counts of fraud and tax evasion. Hubbell moved to dismiss the charges brought against him, and in the alternative for a *Kastigar* hearing, see *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), arguing that the government had violated his Fifth Amendment privilege against self-incrimination in obtaining an indictment based on his immunized document production. Finding that the Independent Counsel had developed its case solely on the basis of records that Hubbell had turned over under the grant of statutory use-immunity, the district court dismissed the indictment with respect to him. As the Independent Counsel had only discovered the extent and nature of Hubbell's alleged tax violations through his response to a government subpoena, the court concluded that the Independent Counsel had improperly turned Hubbell into the primary witness against himself. The government appeals from this ruling, asserting that the district court misconstrued the protection accorded by the federal use-immunity statute, see 18 U.S.C. §§ 6002, 6003, as well as the Fifth Amendment's privilege against self-incrimination with which it is coextensive. Because the

is itself unconstitutional, or that the amendment renders the provision of an independent counsel unconstitutional in its entirety, *Morrison* appears to have no bearing on our interpretation of § 594(f)(1).

district court utilized an improper legal standard in assessing the scope of Hubbell's Fifth Amendment privilege, we vacate its decision and remand for it to conduct a hearing as to the extent of the Independent Counsel's knowledge of the records maintained by Hubbell at the time the subpoena issued.

### A. Background

In the course of its ongoing investigation into possible criminal activity related to Madison Guaranty Savings & Loan Association and the Whitewater Development Corporation, the Independent Counsel learned that Webster Hubbell had received payments from entities "associated with" President William Jefferson Clinton for consulting work allegedly performed after Hubbell's 1994 resignation from his position as the Associate Attorney General. *See In re Madison Guar. Sav. & Loan Ass'n,* Div. No. 94–1 (D.C.Cir. Spec. Div. filed Dec. 31, 1997) (application for order of referral to Independent Counsel at 3). Through a preliminary investigation undertaken on its own initiative, the Independent Counsel sought to determine whether the payments were related to what it later described as Hubbell's "unwillingness to cooperate fully with the [Whitewater] investigation, as his plea agreement obligated him to do." *Id.* On October 31, 1996, the federal grand jury in the Eastern District of Arkansas issued a subpoena directing Hubbell to turn over eleven categories of business and income related documents, as well as personal records of his activities and of his family's finances, covering the period from January 1, 1993 to the date of the subpoena.[12]

12. The subpoena commanded production of: a) all documents reflecting, referring, or relating to any direct or indirect sources of money or other things of value received by Webster Hubbell, his wife or children (collectively, the "Hubbell family"), including but not limited to the identity of employers or clients of legal or any other type of work; b) all documents reflecting or referring to any sources of money or other things of value received by the Hubbell family, including billing memoranda, draft statements, bills, final statements and/or bills for work performed or time billed; c) copies of all bank records of the Hubbell family, including statements, registers, ledgers, canceled checks, deposit items and wire transfers; d) all documents reflecting time worked or billed by Webster Hubbell during the course of any work performed or to be performed; e) all documents reflecting expenses incurred by and/or disbursements of money by Webster Hubbell for work performed or to be performed; f) all documents reflecting Webster Hubbell's schedule of activities, including but not limited to all calendars, daytimers, time books, appointment books, diaries, records of reverse telephone toll charges, credit card calls, telephone message slips, logs, other telephone records, minutes databases, electronic mail messages, travel records, itineraries, tickets for transportation of any kind, payments, bills, expense backup documentation, schedules, and/or any other document or database that would disclose Webster Hubbell's activities; g) all documents reflecting any retainer agreements or contracts for employment of the Hubbell family; h) all tax returns, tax return information, including but not limited to all W–2s, form 1099s, schedules, draft returns, work papers, and backup documents filed, created or held by or on behalf of the Hubbell family, and/or any business in which the Hubbell family holds or has held an interest; i) all documents reflecting work performed or to be performed for the City of Los Angeles, California, the Los Angeles Department of Airports or any other Los Angeles municipal or governmental entity, Mary Leslie, and/or Alan Arkatov, including but not limited to correspondence, retainer agreements, contracts, time sheets, appointment calendars, activity calendars, diaries, billing statements, billing memoranda, telephone records, telephone message slips, telephone credit card statements, itineraries, tickets for transportation, payment records, expense receipts, ledgers, check registers, notes, memoranda, electronic mail, bank deposit items, cashier's checks, traveler's checks, wire transfer records and/or other records of financial transactions; j) all documents relating to work performed or to be performed by the Hubbell family on the recommendation of Mary Leslie and/or Alan Arkatov, including but not limited to correspondence, retainer agreements, contracts, time sheets, appointment calendars, activity calendars, diaries, billing statements, billing memoranda, telephone records, telephone message slips, telephone credit card statements, itineraries, tickets for transportation, payment records, expense receipts, ledgers, check registers, notes, memoranda, electronic mail, bank deposit items, cashier's checks, traveler's checks, wire transfer records and/or records of other financial transactions; k) all documents related to work performed or to be performed on behalf of Lippo Ltd., the Lippo Group, the Lippo Bank, Mochtar Riady, James Riady, Stephen Riady, John Luen Wai Lee, John Huang, Mark Grobmyer, C. Joseph Giroir, Jr., or any affiliate owned or controlled by such individuals or entities, including but not limited to correspondence, retainer agreements, contracts, time sheets, appointment calendars, activity calendars, diaries, billing

On November 19, 1996, Hubbell appeared before a grand jury in the Eastern District of Arkansas and formally invoked his Fifth Amendment privilege against self-incrimination. When questioned, he expressly "decline[d] to state whether there are documents within my possession, custody, or control responsive to the Subpoena." 11/19/1996 Tr. at 2. The Independent Counsel had previously obtained an order signed by Judge Susan Webber Wright—under 18 U.S.C. §§ 6002, 6003—directing Hubbell to respond and granting immunity "to the extent allowed by law." *In re Grand Jury Proceedings*, No. GJ–96–3 (E.D.Ark. Nov. 14, 1996) (order compelling production of documents). After receiving immunity, Hubbell turned over some 13,120 pages of documents and records. The Independent Counsel then led Hubbell through a series of questions tied to each of the eleven categories of documents requested in the subpoena. With respect to each, the Independent Counsel read the relevant paragraph (or a summary thereof) and then asked either, "Did you provide all those documents?" or "Those are all the records in your possession, custody, or control; is that correct?" Hubbell answered "Yes" to all eleven queries.[13] The Independent Counsel closed the session by inquiring "have you searched or have you made a thorough search or caused a thorough search to be made in response to this Subpoena?" Hubbell again replied "Yes." 11/19/1996 Tr. at 11–12.

The Independent Counsel's search for evidence into whether Hubbell might have obstructed its Whitewater investigation revealed potential violations of the Internal Revenue Code. Using the contents of the documents Hubbell turned over to the grand jury, the Independent Counsel identified and developed evidence that culminated in the prosecution at issue in this case. On April 30, 1998, a federal grand jury in the District of Columbia issued a ten-count indictment alleging that Webster Hubbell, Suzanna Hubbell, Michael Schaufele and Charles Owen[14] had conspired to defraud the United States Department of the Treasury and Internal Revenue Service, the State of Arkansas, the District of Columbia, and the Rose Law Firm of monies owed by Webster and Suzanna Hubbell (collectively, the "Hubbells").[15] The indictment further alleged that all four defendants had endeavored to obstruct and impede the due administration of the revenue laws, in violation of 26 U.S.C. § 7212(a), to evade payment of the proper income tax owed by the Hubbells for the calendar years 1989–1992 and 1994–1995, in violation of 26 U.S.C. § 7201, and committed both mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343. Additionally, Michael Schaufele and Webster Hubbell were each charged with preparing and presenting a fraudulent tax return, in violation of 26 U.S.C. § 7206(2).

Substantively, the indictment alleged that Webster Hubbell had received large payments for consulting services, and then conspired to hide this and other income through elaborate financial machinations. *Inter alia,* the indictment claims that Hubbell under-reported his 1994 consulting income by approximately $74,000, and failed to make any payments towards the tax obligations arising out of either the roughly $375,000 he did acknowledge earning or the $178,000 already owed from the willful tax evasion charge to

statements, billing memoranda, telephone records, telephone message slips, telephone credit card statements, itineraries, tickets for transportation, payment records, expense receipts, ledgers, check registers, notes, memoranda, electronic mail, bank deposit items, cashier's checks, traveler's checks, wire transfer records and/or records of other financial transactions.

13. With respect to paragraphs f and j, Hubbell answered "Yes. Subject to the attorney/client privilege." 11/19/1996 Tr. at 9–10.

14. Michael Schaufele is a certified public accountant, and Charles Owen an attorney. Both are personal friends of Webster and Suzanna Hubbell, and each provided help in the transactions underlying the indictment.

15. The indictment provides a detailed accounting of the Hubbells' financial position from January 1994 through December 1997, surveying their earnings as well as their spending patterns. It documents all of their employment and investment-related sources of income, trust agreements and trust accounts set up in their name, as well as their personal bank accounts and IRA accounts. It also discusses the tax payments made by the Hubbells, their outstanding tax liabilities and other debts, and their consumer purchases.

which he had pled guilty on December 6, 1994.[16] He also made premature withdrawals of more than $233,000 from his Individual Retirement Account ("IRA") without paying the withholding taxes.[17] In December of 1994 and January of 1995, the Hubbells executed three trust agreements—the Webster Hubbell Legal Expense Trust, the Hubbell Children's Education Trust, and the Hubbell Family Support Trust—for each of which Michael Schaufele opened a separate non-interest bearing trust account[18] at the Metropolitan National Bank in Little Rock, Arkansas. In May of 1996, Michael Schaufele opened another non-interest bearing checking account, "for the benefit of Webb and Suzy Hubbell," at Pulaski County Bank in Little Rock, and then used the account to make funds available for the Hubbells' personal spending. In March of 1997, Charles Owen prepared Articles of Organization for a company entitled the Bridgeport Group, LLC, in which Webster and Suzanna Hubbell each owned a forty-nine percent interest and the Hubbell Children's Education Trust the remaining two percent. When Hubbell entered into a book contract with William Morrow and Co. later that year, his $49,500 advance went into the Bridgeport Group's account at Pulaski Bank. The indictment broadly alleges that the Hubbells utilized these varied financial structures so as to spend down their earnings and assets without paying the nearly $900,000 they owed in taxes to the federal government, the state of Arkansas, and the District of Columbia.

In a July 1, 1998 Memorandum Opinion, the district court granted Webster Hubbell's motion to dismiss the indictment as violative of the order giving him immunity and compelling his response to the grand jury's subpoena *duces tecum*. It found that all of the evidence to be offered by the Independent Counsel at trial derived, either directly or indirectly, from Hubbell's immunized response. Beginning with the proposition articulated in *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) that "a grant of immunity must afford protection commensurate with that afforded by the privilege" against self-incrimination, the district court sought to discern the scope of the protection offered by section 6002 through examining the extent of Hubbell's Fifth Amendment privilege. Drawing from the framework sketched in *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and reiterated in *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (*Doe I*), it focused upon the testimonial and incriminating aspects of the act of production. In light of the government's admission that it had utilized "the information provided by Mr. Hubbell pursuant to the production immunity," *United States v. Hubbell*, 11 F.Supp.2d 25, 34 (D.D.C.1998), the court found that Hubbell had not only communicated the authenticity and his possession of the documents, but also implicitly testified as to the very existence of documents which added to the "sum total" of the government's information against him.[19]

16. The Hubbells did not make any tax payments in 1995 either, despite incurring an additional tax liability of greater than $112,000.

17. On each occasion, either Hubbell or Schaufele expressly elected that there be no withholding. The final withdrawal involved what the Independent Counsel has labeled the "Pension Account Check Swap." Hubbell had borrowed approximately $29,000 against his profit sharing/pension plan at the Rose Law Firm. Instead of defaulting on the loans, which would have required mandatory payment of 20% withholding, Schaufele arranged a transaction in which the Rose Law Firm paid the $29,000 out of its profit sharing plan into Hubbell's IRA account. Hubbell had previously given checks to the Rose Law Firm covering the same amount, which were cashed directly after the pension money entered Hubbell's IRA. Hubbell thereby avoided the automatic 20% withholding otherwise ac-

companying a premature pension plan withdrawal.

18. Non-interest bearing bank accounts do not generate Form 1099s, a copy of which would be sent directly to the Internal Revenue Service. *See* 26 C.F.R. § 1.6049–4.

19. The dissent incorrectly argues that "[h]ere the only interesting issue is the 'existence' theory; possession and authentication seem properly outside the case." Dissent at 597. The district court found that Hubbell implicitly testified as to the existence, his possession, and the authenticity of the documents turned over pursuant to the compelled act of production. *See Hubbell*, 11 F.Supp.2d at 35 (arguing that the analysis turns on whether Hubbell implicitly testified "only that the documents were authentic, or only that they were in his possession, or did he

Neither the existence of the documents nor their contents was a "foregone conclusion," *Fisher*, 425 U.S. at 411, 96 S.Ct. 1569, because the Independent Counsel had no source of knowledge independent of Webster Hubbell's immunized act of production. When it utilized the information contained in Hubbell's response to build a case against him, the court concluded, the Independent Counsel violated Webster Hubbell's rights under the Fifth Amendment and the order of immunity. Accordingly, it dismissed Hubbell's indictment.

B. *Discussion*

1. *Hubbell's Privilege Against Self-Incrimination*

a. *The Basic Fifth Amendment Framework for Compelled Document Production*

■ In delineating the proper scope of the Fifth Amendment's privilege against self-incrimination, the Supreme Court has crafted a framework that requires the presence of each of three distinct elements for an individual to make out a claim. Whether addressed to oral testimony or to documentary evidence, the doctrine necessitates a showing of: i) the compulsion; ii) of testimony; iii) that incriminates. *See Fisher*, 425 U.S. at 409, 96 S.Ct. 1569 ("the privilege protects a person only against being incriminated by his own compelled testimonial communications").

■ Any discussion of the Fifth Amendment's application to the production of documents pursuant to a subpoena *duces tecum*

necessarily begins with *Fisher* and *Doe I*. These cases collectively establish the two propositions that structure our inquiry. First, *Fisher* teaches that the Fifth Amendment does not protect the contents of pre-existing, voluntarily prepared documents. Even if written by the hand of the accused, the Fifth Amendment does not extend to writing that was not itself compelled. *See Fisher*, 425 U.S. at 409, 96 S.Ct. 1569; *Doe I*, 465 U.S. at 612 n. 10, 104 S.Ct. 1237 ("If the party asserting the Fifth Amendment privilege has voluntarily compiled the document, no compulsion is present and the contents of the document are not privileged."). While the contents of preexisting documents are not protected, the Court has acknowledged that there are testimonial and potentially incriminating communications inherent in the act of responding to a subpoena which may themselves be protected by the Fifth Amendment. *See Fisher*, 425 U.S. at 410, 96 S.Ct. 1569 ("The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced."). The enforcement authority that rests behind the issuance of any subpoena provides the requisite compulsion. *See id.* at 409, 96 S.Ct. 1569.

■ Specifically, the act of production communicates at least four different statements. It testifies to the fact that: i) documents responsive to a given subpoena exist; ii) they are in the possession or control of the subpoenaed party; iii) the documents provided in response to the subpoena are authentic;[20] and iv) the responding party believes

*also* implicitly testify as to their very existence?") (emphasis added). The district court did focus its discussion on the government's knowledge of the documents' existence, but this emphasis likely emerged from its erroneous reading of *Fisher's* existence prong, *see* discussion *infra* p. 580, together with its reliance on two law review articles arguing that where the government is ignorant as to the existence of subpoenaed documents, the Fifth Amendment's protection necessarily extends to the contents of those documents. *See Hubbell*, 11 F.Supp.2d at 35 n. 13 (citing Robert P. Mosteller, *Simplifying Subpoena Law: Taking the Fifth Amendment Seriously*, 73 Va. L.Rev. 1, 41–43 (1987); Kenneth J. Melilli, *Act-of-Production Immunity*, 52 Ohio St. L.J., 223, 258–60 (1991)). While the court emphasized existence, its findings were not so lim-

ited. Because we are not just "left with 'existence,'" Dissent at 597, our discussion speaks in general terms of existence, possession and authenticity.

20. Although this prong has received little independent discussion, the Court's *Doe I* analysis strongly implies that authenticity refers to something other than the party's belief that surrendered documents match those described in the subpoena. There, the Court discusses authenticity in terms of admissibility under Rule 901 of the Federal Rules of Evidence, recognizing that the act of production could relieve the government of the need to authenticate evidence. *See Doe I*, 465 U.S. at 614 n. 13, 104 S.Ct. 1237. In this sense, authenticity refers to whether a document is genuine, as opposed to a forgery or fabrica-

that the documents produced are those described in the subpoena. *See Fisher,* 425 U.S. at 410, 96 S.Ct. 1569; *Doe I,* 465 U.S. at 614 n. 13, 104 S.Ct. 1237.[21] Nevertheless, not every act that communicates one or more of these statements rises to the level of a protected communication under the Fifth Amendment. As *Fisher* itself illustrates, the act of producing documents in response to a subpoena will not merit protection unless it communicates something of substance to the state. Where the government already has the knowledge that would otherwise be conveyed, "[t]he question is not of testimony but of surrender." *Id.* at 411, 96 S.Ct. 1569 (quoting *In re Harris,* 221 U.S. 274, 279, 31 S.Ct. 557, 55 L.Ed. 732 (1911)).

In *Fisher,* the IRS had issued a summons to a taxpayer's attorney to produce documents that had been prepared by the taxpayer's accountant. At the time the subpoena issued, the IRS knew a great deal about the requested documents. In each of the two cases jointly considered by the *Fisher* Court, the IRS had highly specific knowledge as to the existence of the accountant's work papers as well as to their location in the hands of the summoned attorney. *See id.* at 394, 96 S.Ct. 1569 ("In No. 74–18 the documents demanded were analyses by the accountant of the taxpayers' income and expenses which had been copied by the accountant from the taxpayers' canceled checks and deposit receipts.").[22] Moreover, as the papers originally belonged to the accountant, they could be authenticated independent of the taxpayer's communicative act of production. The testimony implicit in responding to the subpoena was essentially empty, as it did not augment the government's preexisting knowledge perceptibly. In these circumstances—where the "existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers," and where "the Government is in no way relying on the 'truthtelling' of the taxpayer to prove the existence of or his access to the documents," *id.* at 411, 96 S.Ct. 1569—the Court held that the Fifth Amendment's protections were not implicated. *See id.*

*Doe I* provides an illustrative counterpoint, as the government there knew little about the documents it subpoenaed. As part of its investigation into corruption in the awarding of municipal contracts, a grand jury issued five separate subpoenas to the respondent that collectively sought a wide range of business records from his various solo proprietorships. In the proceedings below on his motion to quash, the district court had concluded that "enforcement of the subpoenas would compel respondent to admit that the records exist, that they are in his possession, and that they are authentic.... The government argues that the existence, possession and authenticity of the documents can

---

tion. For example, to the extent that Hubbell turned over a calendar that recorded how he allocated his time, his compelled act of production testifies to the calendar's authenticity.

**21.** A number of our sister circuits have reduced these four potential statements down to two questions: i) whether production admits the existence, possession or control of the documents; and ii) whether production implicitly authenticates the documents or verifies that they are those sought in the subpoena. *See, e.g., United States v. Fishman,* 726 F.2d 125, 127 (4th Cir. 1983); *United States v. Fox,* 721 F.2d 32, 36 (2d Cir.1983). Given that the elements are identical, we see no conceptual difference in describing the inquiry as raising four or two potential questions.

We do reject, however, our dissenting colleague's attempt to eliminate outright two of the four statements that, as the Supreme Court instructed in *Fisher* and *Doe I,* are potentially communicated through the act of production.

The dissent collapses the first and third statements—existence and authentication—into the fourth, asking only whether the subpoenaed party has linked the documents produced to those described in the subpoena. *See* Dissent at 599 ("the only sense of 'existence' that is covered by the Fifth Amendment is that which refers back to the subpoena.... [to] the witness's implicit match of the documents with the subpoena's description."). This exclusive obsession with what it calls "the context of the subpoena," Dissent at 602, disregards the letter as well as the logic of *Fisher* and *Doe I,* effectively eviscerating the Fifth Amendment's act of production privilege. *See* discussion *supra* pp. 567–568 and note 20; *infra* pp. 573–575, 583–584.

**22.** In the other case, No. 74–611, the documents entailed an accounting firm's work papers concerning the taxpayer's books and records, retained copies of income tax returns, and retained copies of correspondence between the firm and the taxpayer. *See id.* at 394, 96 S.Ct. 1569.

be proved without respondent's testimonial communication, but it cannot satisfy this court as to how that representation can be implemented to protect the witness in subsequent proceedings." *Id.* at 613 n. 11, 104 S.Ct. 1237. Similarly, the Third Circuit found nothing indicating that the government "knows, as a certainty, that each of the myriad of documents demanded by the five subpoenas in fact is in the appellee's possession or subject to his control. The most plausible inference to be drawn from the broad-sweeping subpoenas is that the Government, unable to prove that the subpoenaed documents exist ... is attempting to compensate for its lack of knowledge by requiring the appellee to become, in effect, the primary informant against himself." *Id.* at 613–14 n. 12, 104 S.Ct. 1237. Finding that the government had failed to rebut respondent's claim "by producing evidence that possession, existence, and authentication were a 'foregone conclusion,'" *id.* at 614 n. 13, 104 S.Ct. 1237, the Supreme Court upheld the lower court's factual determination that complying with the subpoena would involve testimonial self-incrimination. *See id.* at 614, 104 S.Ct. 1237.

Against this settled backdrop, the case at bar presents a series of unsettled questions. Our sister courts have yet to reach agreement on the particular elaboration and proper application of the *Fisher* and *Doe I* framework. The degree to which a communication. must be testimonial, what the *Doe I* Court described as its "testimonial value," 465 U.S. at 613, 104 S.Ct. 1237, before it will invoke the Fifth Amendment's protections necessarily falls somewhere in between the poles represented by *Doe I* and *Fisher*. Precisely where on this continuum a given document production crosses the rubicon remains undetermined. The same can be said for the requisite quantum of incrimination. Finally, since Webster Hubbell produced the subpoenaed documents under a grant of immunity, we must also determine the extent of the protection afforded by section 6002. As *Kastigar* teaches, that inquiry leads us straight back to the scope of the Fifth Amendment privilege. *See* 406 U.S. at 453,

92 S.Ct. 1653 (immunity must be commensurate with the Fifth Amendment's protections). Bearing in mind the Supreme Court's prescription that "[t]hese questions perhaps do not lend themselves to categorical answers," and that "their resolution may instead depend on the facts and circumstances of particular cases or classes thereof," *Fisher*, 425 U.S. at 410, 96 S.Ct. 1569; *Doe I*, 465 U.S. at 613, 104 S.Ct. 1237, we discuss each in turn.

### b. *Testimonial Communications*

The court below found that Hubbell's compelled act of production required him to make communications as to the authenticity, possession, and existence of the documents. *See Hubbell*, 11 F.Supp.2d at 35.[23] Sidestepping this conclusion, the Independent Counsel argues that the Fifth Amendment's protection should not attach because Hubbell's response to the subpoena had insufficient testimonial value. In its view, the documents' existence was what *Fisher* described as a "foregone conclusion." Accordingly, the actual act of production itself—the only compelled communication involved in the case of a document subpoena—did not rise to a level of communication that would merit the Fifth Amendment's protection. We disagree.

The Independent Counsel glosses over what we consider to be an essential component of any inquiry into the testimonial value of a given act of production—the quantum of information possessed by the government before it issued the relevant subpoena. Instead, it makes two separate assertions as to why the documents' existence should be deemed a foregone conclusion. First, the Independent Counsel claims that the most natural reading of *Fisher* counsels against recognizing a testimonial value in the production of ordinary income, financial, and business records like those subpoenaed here. Since people generally possess such records, and since the government cannot be expected or required to know with exactitude the documents that any individual suspected of wrongdoing might have at a given time, the

---

**23.** The district court erred, however, in focusing upon the Independent Counsel's knowledge of contents of the subpoenaed documents and the information contained therein. *See* discussion *infra* p. 580.

existence of these categories of documents, and of corresponding documents falling within the categories, should be regarded as a foregone conclusion. However, the Independent Counsel's argument is not only flawed in logical terms, but it misconstrues Supreme Court precedent in this admittedly abstract and under-determined area of the law. The argument makes the classical error in the field of logic of assuming that the occurrence of future events can be logically deduced from observations rooted in the past. Empirical knowledge, as David Hume and Bertrand Russell teach, can only be *a postiori*, not *a priori*. *See* David Hume, *Enquiries Concerning the Human Understanding and Concerning the Principles of Morals* § IV (L.A. Selby–Biggs ed., 1980); Bertrand Russell, *The Problems of Philosophy*, 60–69 (Galaxy 1959) (that the sun rose today and as far back as the mind remembers does not establish that it will rise tomorrow). Moreover, contrary to the Independent Counsel's characterization, the Supreme Court's cases reflect such an understanding, and require actual knowledge rather than mere inductive generalizations. In *Fisher*, for example, the IRS had precise knowledge of the existence and location of accountant's work papers sought through the challenged subpoena. The taxpayer had also stipulated to both the existence of the documents and that they were those described in the subpoena. *See Fisher*, 425 U.S. at 430 n. 9, 96 S.Ct. 1569 (Brennan, J., concurring). The actual production of such records accordingly added little, independent of the documents' substance, to the government's quantum of knowledge. Its testimonial value was negligible. In *Doe I*, by contrast, where the government sought a broad range of material which could similarly be classified as ordinary income, financial and business records, the Court held that the act of production would have testimonial value meriting Fifth Amendment protection.[24] While the Court

---

**24.** The dissent attempts to obscure the Court's holding by arguing that "the implications [of *Doe I*] are quite unclear." Dissent at 599. "The Court relied explicitly and entirely on the 'two courts' rule," and although it rehearsed "the arguments embraced in the courts below," it relied "on the anticipated use of the act of production for authentication of the documents, *i.e.*, use of an indisputably testimonial aspect of subpoena compliance." *Id.* The dissent's dual concerns about the continuing viability of *Doe I* are, respectively, unfounded and inaccurate. The *Doe I* Court did rely upon the "two court" rule in upholding the *fact-findings* of the district and appellate courts below, but that reliance in no way undercuts the vitality of its *legal* holding. The "two-court" rule rests upon the division of labor within the federal courts, and the Supreme Court's station atop this structure as the court of last resort. As the Supreme Court noted in *Rogers v. Lodge*, 458 U.S. 613, 622–23, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), the case cited for the "two-court" rule in *Doe I*, reviewing courts do not generally operate as finders of fact; they disturb historical fact determinations only when clearly erroneous. Supreme Court Rule 10, which indicates the character of the reasons the Court finds compelling when considering a petition for a writ of certiorari, testifies to the Court's almost exclusive legal focus. As reasons for granting a petition, it lists: inter-circuit splits, conflicts between a circuit court and a state court of last resort on an important federal question, conflicts between two state courts of last resort on an important federal question, and decisions by a circuit court or a state court of last resort on an important legal conclusion that should be settled by the Court. *See* Sup.Ct. R.

10. "A petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law." *Id.*

Any assertion that the *Doe I* Court's reliance on the "two-court" rule somehow undercuts its precedential force ignores the Supreme Court's understanding of its role atop the judicial branch. The factual conclusions on which the Court relied—that the witness's act of production would involve testimonial self-incrimination by communicating the existence, possession, and authenticity of the subpoenaed documents—were only relevant to the extent that their presence had legal consequences. Despite the dissent's attempt to argue it away, *Doe I* explicitly held that the Fifth Amendment protects against such compelled communication, *see* 465 U.S. at 614, 104 S.Ct. 1237, and that the subpoena could not be enforced absent a grant of statutory use-immunity under 18 U.S.C. §§ 6002, 6003. *See id.* at 617, 104 S.Ct. 1237.

The dissent's second argument for limiting *Doe I* is misleading. As the dissent points out, the Court did reference "the anticipated use of the act of production for authentication of the documents." Dissent at 599. In the preceding sentences, however, the Court also noted respondent's argument that "by producing the records, he would tacitly admit their existence and his possession." *Doe I*, at 614 n. 13, 104 S.Ct. 1237. The Court left open the possibility that the government could rebut respondent's claim by producing evidence that would show this testimonial communication to be a foregone conclusion, but its holding clearly embraced all three elements as

left open the possibility in future cases that the government could rebut such a finding by producing evidence that would establish its prior knowledge, the fact that the subpoena sought income, financial and business records did not undercut the testimonial value of the act of production. *See Doe I,* 465 U.S. at 614 n. 13, 104 S.Ct. 1237.

The other cases relied upon by the Independent Counsel are equally ineffectual in bolstering its assertions. In *United States v. Rue,* 819 F.2d 1488 (8th Cir.1987), cited for the proposition that courts should assess the testimonial value of document production by reference solely to a document's category, the Eighth Circuit did not hold—as the Independent Counsel claims—that affixing a label of "financial" or "business" to characterize a set of records would be sufficient to make their existence, possession or authenticity a foregone conclusion. While the court did speak in terms of categories of documents, it did so because the subpoena itself had sought four separate categories of documents in the same way that the subpoena here sought eleven categories (or contained eleven paragraphs). In *Rue,* before the contested subpoena even issued IRS agents had actually been permitted to examine monthly and year-end statements relating to Dr. Rue's dentistry practice, forms containing individual patient treatment information used to produce those financial statements, and appointment books. *See Rue,* 819 F.2d at 1490. As to these three categories, the government had first-hand knowledge of the documents' existence and their whereabouts. As to the fourth—patient records detailing services rendered and accompanying charges—Dr. Rue's repeated admissions that the documents existed and the capacity for independent authentication by other witnesses supported the conclusion that any testimony rendered through production was a foregone conclusion. *See id.* at 1493–94.

■ *United States v. Fishman,* 726 F.2d 125 (4th Cir.1983), similarly defies the char-acterization that the Independent Counsel tries to give it; that generalized knowledge about particular occupations can make the existence of documents a foregone conclusion.[25] In support of this contention, the Independent Counsel cites language in the Fourth Circuit's opinion that "[b]eing business records of Dr. Fishman, their existence in the circumstances of this particular case and his possession or control are self-evident truths, and hardly need to be proven through resort by the Government to the act by the owner in turning them over." *Id.* at 127. However, this sentence comes from a paragraph discussing the question of potential incrimination, and is immediately preceded by the statement that "it is difficult to contemplate how mere existence, possession or control of the documents amounts to *incriminating* evidence." *Id.* (emphasis added). Moreover, in discussing the testimonial value of the act of production, independent from the question of incrimination, the *Fishman* opinion expressly disavows the reading that the Independent Counsel attempts to place upon it here. Rejecting the contention that Dr. Fishman had implicitly admitted the existence and his possession of the documents, the court noted that Dr. Fishman's "generalized reference to the subpoenaed records acknowledges the existence of a category, but does not make any representation or admission as to what documents fall into it, or whether any particular document is in existence." *Id.* at 127 n. 4. We agree with the Fourth Circuit that mere reference to a category of records, and the accompanying belief that certain individuals should maintain them, cannot and does not eliminate the testimonial value inherent in the act of production. The government's knowledge must have greater depth, and a substantiation that goes beyond mere conjecture. *See Fox,* 721 F.2d at 37 (rejecting argument from revenue agent's experience as to whether physician likely maintains records sought via subpoena).

---

potentially testimonial. Under *Fisher* and *Doe I,* all three—existence, possession, and authentication—are "indisputably testimonial aspect[s] of subpoena compliance." Dissent at 599.

**25.** Given the nature of Hubbell's consulting work following his departure from the Justice Depart-

ment, the Independent Counsel claims it to be a foregone conclusion at the time of the subpoena that authentic business records existed and were in Hubbell's possession.

■ Second, the Independent Counsel asserts that it actually had the requisite knowledge of the existence and Hubbell's possession of the documents sought through the grand jury's subpoena. We cannot agree on the record before us. The Independent Counsel relies upon the fact that Hubbell had discussed his consulting work in testimony given before Congress, and that the Department of Transportation Inspector General had issued a report which discussed Hubbell's work for the Los Angeles Department of Airports. Taken together, though, these snippets of information do not come close to establishing the existence of the myriad of documents sought through the subpoena. The knowledge that Hubbell had one or two clients establishes very little else, and certainly does not even approach the level of establishing that Hubbell had done work for fifteen separate clients, let alone the type of records he kept of those activities. · The Independent Counsel also emphasizes its thorough knowledge of Hubbell's financial records as a result of its investigation into charges that Hubbell committed tax and mail fraud while working at the Rose Law Firm. During the period of time with which the Independent Counsel claims familiarity— 1989–1992—Hubbell worked as the billing partner at a law firm in Little Rock, Arkansas. During the period of time underlying this prosecution, Hubbell worked in Washington, D.C. as a consultant, and served out a term in prison for the mail and tax fraud counts to which he previously pled guilty. Unless the Independent Counsel can establish its knowledge with a greater degree of specificity, the mere allegation that it was once familiar with Hubbell's finances does not make the existence or possession of the records sought a foregone conclusion. *See Maggio v. Zeitz,* 333 U.S. 56, 65, 68 S.Ct. 401, 92 L.Ed. 476 (1948) (orders enforcing a subpoena "should not be issued ... merely on proof that at some past time [the summoned documents were] in [the] possession or control of the accused party, unless the time element and other factors make that a fair and reasonable inference").

### i. *The Legal Standard*

To formulate an appropriate legal standard as to the degree of prior knowledge needed to render the existence, possession or authenticity of documents a foregone conclusion, it is necessary to return to first principles. *See Doe v. United States,* 487 U.S. 201, 209, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988) (describing *Fisher* and *Doe I* as applying "basic Fifth Amendment principles" articulated in general terms) (*Doe II*). As the Supreme Court moved away from the doctrine articulated in *Boyd v. United States,* 116 U.S. 616, 634–35, 6 S.Ct. 524, 29 L.Ed. 746 (1886) ("a compulsory production of the private books and papers of the owner of goods sought to be forfeited ... [compels] him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution."), and towards a more literal interpretation of the privilege against self-incrimination, *see Fisher,* 425 U.S. at 401, 96 S.Ct. 1569 ("We cannot cut the Fifth Amendment completely loose from the moorings of its language ..."), it jettisoned the personal privacy justification in favor of a rationale tied far more directly to the nature of government compulsion.

■ The core idea can be traced back at least to Justice Holmes' decision in *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), in which the Court rejected a Fifth Amendment challenge to a witness' testimony establishing that the defendant had donned and fit into a blouse worn in a murder for which he was being tried. Dismissing what he characterized as an "extravagant" allegation, Justice Holmes explained that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Id.* at 252–53, 31 S.Ct. 2. Justice Holmes thereby drew a fundamental distinction between government action that extorts communication—such action falls within the umbrella of protection afforded by the Fifth Amendment—and government action that merely utilizes the body of the accused as a form of evidence—that kind of action falls outside the Amendment's particular orbit. Subsequent cases echo and develop this focus upon the

Fifth Amendment as a barrier against compulsion that acts upon, and requires the exercise of an individual's mental faculties for communication.[26] *Schmerber v. California,* 384 U.S. 757, 764–65, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (privilege against self-incrimination does not extend to a compelled blood sample), *Gilbert v. California,* 388 U.S. 263, 265–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (privilege does not extend to compelled handwriting exemplar), *United States v. Wade,* 388 U.S. 218, 222–23, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (privilege does not extend to compelled voice exemplar), and *United States v. Dionisio,* 410 U.S. 1, 5–6, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (privilege does not extend to compelled voice sample), all rely upon the essential distinction between compulsion which operates upon the mind by forcing the accused to communicate information or testimony, and compulsion which merely requires him to produce his body for inspection. While in each instance the government draws evidentiary inferences as a result of the compulsion, the Fifth Amendment only protects against those inferences which derive from compelled communication. *See Pennsylvania v. Muniz,* 496 U.S. 582, 593, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (though videotape of the defendant exhibiting signs of intoxication does not violate the Fifth Amendment, videotape showing the defendant's inability to respond to a question about the date of his sixth birthday does); *Doe II,* 487 U.S. at 211 n. 10, 108 S.Ct. 2341 (describing the *Schmerber* line of cases as distinguishing between "the suspect's being compelled himself to serve as evidence and the suspect's being compelled to disclose or communicate information or facts that might serve as or lead to incriminating evidence"); *Schmerber,* 384 U.S. at 765, 86 S.Ct. 1826 ("Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis" of appellant's blood); *Dionisio,* 410 U.S. at 5–6, 93 S.Ct. 764 ("It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by the privilege against compulsory self-incrimination.").

The dissent misreads the letter and logic of *Fisher* and *Doe I* because it fails to grasp the significance of the Supreme Court's distinction between compulsion which uses the body as evidence and that which operates upon the mind by compelling communicative acts. Instead, our colleague attempts to dissect the testimonial and non-testimonial elements of providing blood, voice and handwriting samples. He argues that in giving blood, a person implicitly says, "This is my blood", Dissent at 598; in providing a handwriting sample, the accused admits his ability to write and that the exemplar is his. *See id.* at 4, 93 S.Ct. 764. But because in both these cases, it will require another witness to identify the accused's voice as that of a bank robber, or DNA testing to match the accused's blood with stains left at a crime scene, the giving of blood or an exemplar will not be considered protected testimony. *See id.* at 3, 93 S.Ct. 764. While undoubtedly true, the point is ultimately tangential to the proper inquiry. The real question at issue in *Holt, Schmerber, Wade,* and *Gilbert* was whether the government had merely used the accused's body as a form or piece of evidence, or whether the government had to compel communicative testimony to obtain the evidence it needed. Justice Holmes' *Holt* opinion likened trying on a blouse to simply sitting before the jury and allowing them to compare your features to that contained in a photograph of the perpetrator. *See* 218 U.S. at 253, 31 S.Ct. 2. While it can be argued that the accused implicitly testified about something in each of the cases cited by the dissent—that this is my blood containing my unique DNA, that this is my face with all of

---

**26.** The dissent argues that we "confuse[] the issue with [this] rather odd distinction." Dissent at 600. However, as our ensuing discussion well indicates, this distinction derives directly from the Supreme Court's decisions in *Holt* and its progeny. *See also Pennsylvania v. Muniz,* 496 U.S. 582, 597, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (distinguishing the compelled presentation of identifying physical characteristics from the requirement that a suspect "communicate an express or implied assertion of fact or belief," as the latter imposes "the 'trilemma' of truth falsity or silence and hence the response . . . contains a testimonial component"). The dissent appears to assume the liberty to write on a clean slate.

its characteristic idiosyncracies, that this is my body with a particular shape and size which fits into this blouse—that testimony was irrelevant to the Fifth Amendment inquiry because it required no act of will on his part as to what he would communicate. The same reasoning applies to a compelled submission to fingerprint analysis. The suspect can be said to be communicating that this is my hand and it contains five fingerprints unique to my person, but in reality the individual has merely been compelled to make himself available as a "source of 'real or physical evidence.'" *Schmerber*, 384 U.S. at 764, 86 S.Ct. 1826. For purposes of Fifth Amendment analysis, it is dispositive that the government has no need to rely upon the witness's truthtelling to secure the evidence it seeks.

The dissent cites to *Holt, Schmerber, Wade,* and *Gilbert* for the proposition that where the government can draw a link between evidence and the accused, independent of the accused's testimony, the Fifth Amendment does not apply. *See* Dissent at 597–599, 602. None of these cases, read individually or taken together, however, stands for this general proposition. All of the cases focused on whether the act in question was communicative or noncommunicative—whether it relied upon the individual's mental faculties and truthtelling capacity or merely used the body as a source of physical evidence—and not on whether the prosecution could link evidence to the accused without relying on his testimony.[27] In each, the Supreme Court concluded that there had been no testimony; accordingly, the Fifth Amendment did not apply. *See, e.g., Schmerber,*

27. The dissent's almost exclusive focus on blood and handwriting stems from its conflation of fundamentally separate inquiries. It measures the testimonial character of a compelled subpoena response by asking, after the fact, whether produced documents can be independently linked back to Hubbell. While these questions go to the *testimonial value* of a given act of production, which is properly assessed by asking whether the existence, possession or authenticity of the documents was a foregone conclusion, the dissent assumes that they instead speak to the prior inquiry into whether the act of production is *testimonial. Fisher, Doe I,* and *Braswell* have already settled this question, teaching that the act of production is inherently communicative. Accordingly, these cases repudiate the dissent's assumption.

The dissent also misreads *Baltimore Dept. of Social Servs. v. Bouknight,* 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990), conflating its inquiry into whether the state could compel production despite Fifth Amendment objections with a separate and conceptually distinct examination of whether that compelled act of production would communicate testimony. In *Bouknight,* the Court held that a mother could not refuse a juvenile court order to produce her child, whom social services suspected she abused, by asserting her privilege against self-incrimination. The Court based its decision on the fact that the child—Maurice—had been declared a "child in need of assistance," *id.* at 552, 110 S.Ct. 900, a judicial determination asserting jurisdiction over Maurice and assigning oversight responsibilities to the Baltimore City Department of Social Services. Ultimately, the *Bouknight* Court confronted a single question—whether the state juvenile court could compel Bouknight to produce her child—and held that Maurice's mother had no choice but to comply. Although the Court con-

cluded that Bouknight could "not invoke the privilege to resist the production order *because* she has assumed custodial duties related to production and because production is required as part of a noncriminal regulatory regime," *id.* at 555–56, 110 S.Ct. 900 (emphasis added), the dissent mistakenly approaches the case as though it rested on a finding that production would not be testimonial. Because it does not, *see id.* at 561–62, 110 S.Ct. 900 (explicitly referencing Fifth Amendment limitations on using any *testimonial aspects* of Bouknight's compelled producing in subsequent criminal proceedings), the dissent's focus upon parsing the mental from the physical components of any act producing Maurice is irrelevant to our (and any) general Fifth Amendment analysis. *See* Dissent at 599–601.

In *Bouknight,* the Court assumed *arguendo* that compelled production would involve sufficient testimonial incrimination to implicate the Fifth Amendment, *see id.* at 555, 110 S.Ct. 900—a critical fact our dissenting colleague ignores. In fact, to the extent that the Court did touch upon the testimonial components of the act of production, its minimal discussion reinforces our reading of *Fisher* and *Doe I,* and directly refutes the dissent's. For example, the Court noted that while producing Maurice would implicitly *testify* to his existence and authenticity, that communication was "*insufficiently incriminating.*" *Bouknight,* 493 U.S. at 555, 110 S.Ct. 900. Because the state already knew of his existence, and presumably his social worker could testify as to his identity, both elements were essentially a foregone conclusion. *See id.* (citing *Fisher's* foregone conclusion analysis). *See also* discussion *infra* pp. 575–578. The dissent's extensive effort to distill contrary principles from *Bouknight* is misguided and unsubstantiated; *Bouknight* cannot and does not bear the meaning that the dissent seeks to assign it.

384 U.S. at 761 n. 5, 86 S.Ct. 1826 (distinguishing acts communicative in nature from the noncommunicative); *Doe II*, 487 U.S. at 211 n. 10, 108 S.Ct. 2341 (the *Schmerber* line of cases "distinguished between the suspect's being compelled to serve as evidence and the suspect's being compelled to disclose or communicate information or facts that might serve as or lead to incriminating evidence"). However, as the *Schmerber* Court went on to state, "[i]t is clear that the *protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers.*" *Id.* at 764, 86 S.Ct. 1826 (emphasis added).

The rationale underlying the act of production trilogy—*Fisher, Doe I,* and *Braswell v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988) [28]—with its emphasis on compelled truthtelling, emerges directly out of this focus upon whether the state operates upon a reluctant witness' mental faculties to compel testimony. *See Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (rooting the Fifth Amendment privilege *inter alia* in "our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt ..."); *South Dakota v. Neville,* 459 U.S. 553, 563, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (same); *Curcio v. United States,* 354 U.S. 118, 128, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957) (forcing custodian of union records who lacks possession to testify as to their whereabouts "requires him to disclose the contents of his own mind. . . . That is contrary to the spirit and letter of the Fifth Amendment."). That is, the act of producing documents in response to a subpoena potentially involves the Fifth Amendment's protections precisely because the subpoenaed party is forced to undertake some communicative act in answering. *See Fisher,* 425 U.S. at 410, 96 S.Ct. 1569; *Doe I,* 465 U.S. at 612, 104 S.Ct. 1237. Each of the four potential statements that adhere to the act of production—existence, possession, authenticity, and the belief that the produced documents match the subpoena's terms—can merit protection because they entail "the extortion of information from the accused, the attempt to force him to disclose the contents of his own mind. . . ." *Doe II,* 487 U.S. at 211, 108 S.Ct. 2341 (internal citations omitted).[29] In terms of the dichotomy articulated in *Holt* and its progeny, they fall on the side of the communicative and testimonial.

■ In assessing the testimonial value of an act of production, it makes sense to reference the anti-extortion principle which has become the motivating force of self-incrimination doctrine. In light of *Fisher, Doe I,* and *Doe II,* we conclude that the testimonial value varies directly with the quantum of information that the government seeks to extract through compelling the expression of the contents of an individual's mind and inversely with the quantum of information in the government's possession at the time the relevant subpoena issues.[30] *Cf. Muniz,* 496

---

**28.** In *Braswell,* the Court held that a custodian of corporate records could not evade a subpoena seeking records from his corporation through asserting his Fifth Amendment privilege against self-incrimination. Although Mr. Braswell effectively served as the corporation's sole owner and officer—his wife and mother were nominal officers so as to satisfy a Mississippi law requiring corporations to have three directors—he necessarily operated in a representative capacity, under the "collective entity" doctrine, in his duties as custodian. *See* 487 U.S. at 110, 108 S.Ct. 2284. When acting as a corporate agent, the Court held, an individual cannot assert his personal Fifth Amendment rights; similarly, the act of production can only be used against the corporation and not against the custodian. *See id.* at 118 & n. 11, 108 S.Ct. 2284.

**29.** In *Doe II,* the Court upheld an order compelling the target of a grand jury investigation to sign a series of consent forms authorizing banks in the Cayman Islands and Bermuda to disclose records for any account to which petitioner was a signatory. Since signing the consent forms did not involve or imply an assertion of fact or a disclosure of information, the Court concluded that the order did not run afoul of the privilege against self-incrimination.

**30.** The former constitutes the more important formulation, as it ties testimonial value directly to the disparity between the government's knowledge and that of the subpoenaed party. It focuses directly upon the government's need to access the contents of an individual's mind. By contrast, although the government may have little information with respect to whether a suspect's

U.S. at 597, 110 S.Ct. 2638 ("the cases upholding compelled writing and voice exemplars did not involve situations in which suspects were asked to communicate personal beliefs or knowledge of facts . . ."). Although the Supreme Court has not explicitly stated as much, our conclusion is fully in accord with, and even helps to explain, the Court's repeated statement that the question of whether tacit averments are sufficiently testimonial as to merit the Fifth Amendment's protection depends "on the facts and circumstances of particular cases or classes thereof."[31] *Fisher,* 425 U.S. at 410, 96 S.Ct. 1569; *Doe I,* 465 U.S. at 613, 104 S.Ct. 1237; *Braswell,* 487 U.S. at 103, 108 S.Ct. 2284. Moreover, although our sister courts have undertaken particular analyses in light of general Fifth Amendment principles, the conclusions they have reached in individual cases can largely be reconciled with this formulation.[32]

In those cases in which our sister circuits have declined to recognize the existence of a Fifth Amendment privilege, the government has usually had extensive information regarding the documents it subpoenaed. While the act of production would still force an individual to communicate knowledge and to reveal the contents of his mind, the government would in no way be relying upon the communication inherent in the act. It is only in those instances where the gap separating the government's knowledge with respect to the existence, possession, location or authenticity of documents from that of the subpoenaed party is wide that our sister circuits have recognized a testimonial value sufficient to merit the Fifth Amendment's protections.

---

DNA or fingerprints match those of a suspected culprit, and the government will extract a great deal of information from a blood sample or a handwriting exemplar, neither probes the contents of one's mind to compel testimony. Everything of evidentiary value traces to the body as a source "real," as opposed to communicative, evidence.

31. Our dissenting colleague remarks that "[t]he most confusing part of *Fisher* is the language that the courts have taken to tie 'foregone conclusion' closely to the 'testimonial' analysis and vice versa." Dissent at 598. Because we think that the "foregone conclusion" limitation emerges directly from the logic underlying the act of production doctrine, we do not share our colleague's confusion. *Fisher* and *Doe I* state the general proposition that the act of producing documents in response to government subpoena communicates. It provides testimony rather than physical or real evidence, and this testimony comes in four recognized forms. *See* discussion *supra* pp. 567–568. However, in that subset of cases in which the testimonial value of this communication is minimal—exemplified by *Fisher* itself—that testimony will not merit the Fifth Amendment's protection. Where the government need not rely upon the truthtelling of the witness, because it has prior knowledge of the information that will be communicated through the act of production, "no constitutional rights are touched." *Fisher,* 425 U.S. at 411, 96 S.Ct. 1569 (quoting *In re Harris,* 221 U.S. at 279, 31 S.Ct. 557). Where all that would be communicated is a "foregone conclusion," "the question is not of testimony but of surrender." *Id.*

The foregone conclusion analysis, which examines the testimonial value of the accused's act of production, has nothing to do with the general question of whether the act of producing documents in response to a subpoena is testimonial. *Fisher, Doe I,* and *Braswell* all teach that it is. The Court's discussion of handwriting and blood samples goes only towards answering this prior question. For example, while the Court notes that an accused forced to give a handwriting exemplar implicitly admits that he can write and that the writing produced is his own, it declares the first admission a "near truism" and the second "self-evident." *Fisher,* 425 U.S. at 411, 96 S.Ct. 1569. "[A]lthough the exemplar may be incriminating to the accused and although he is compelled to furnish it, his Fifth Amendment privilege is not violated because nothing he has said or done is deemed to be *sufficiently testimonial* for purposes of the privilege." *Id.* (emphasis added). By contrast, the act of production, which is inherently testimonial, may or may not be *sufficiently testimonial* for purposes of the privilege. The Fifth Amendment will not necessarily apply to all such communications; it "depends on the facts and circumstances of particular cases or classes thereof." *Id.* at 410, 96 S.Ct. 1569.

32. Our dissenting colleague contends that these cases can be lined up in part "because the factual detail of the cases is so skimpy and the majority's test so elastic." Dissent at 601. However, as will become evident from our discussion, the pejorative label "skimpy" rightly attaches only to the extent of the government's knowledge in those cases where courts have recognized a valid Fifth Amendment privilege. In all of the cases we discuss, the factual details are rich and revealing. While, for the sake of brevity, we have limited our recounting to a relevant summary, we refer our colleague's attention to the appropriate pages in the federal reporter.

In *United States v. Schlansky,* 709 F.2d 1079 (6th Cir.1983), for example, the IRS had issued a highly specific subpoena reflecting detailed knowledge of the documents it sought. In particular, the summons asked for the production of "[a] ring binder containing 8" by 12" sheets (approximate), 3 inches deep, containing cancelled checks, bank statements, invoices, receipts glued to the accountants worksheets for the years 1976 and 1977." *Id.* at 1081. Since the existence of the binder, its contents, and their possession by Mr. Schlansky were not in dispute, and since authentication was available from other sources, the Sixth Circuit concluded that Schlansky's response to the subpoena would not involve testimonial self-incrimination. The Second Circuit reached a similar result in *United States v. Praetorius,* 622 F.2d 1054 (2d Cir.1979), in which the government had subpoenaed a passport in relation to its investigation of a heroin importation ring. Since the court below had found that the existence and location of the passport were not in question, the Second Circuit affirmed its conclusion that the act of production did not have sufficient testimonial value to implicate the Fifth Amendment. *See id.* at 1063.

*In re Steinberg,* 837 F.2d 527 (1st Cir. 1988), and *United States v. Clark,* 847 F.2d 1467 (10th Cir.1988) also fall within the pattern of cases in which the government's knowledge is nearly on par with that of the subpoenaed individual. In *Steinberg,* the government sought a series of notebooks maintained by members of Lyndon La-Rouche's security staff in which they detailed the progress of a federal investigation into LaRouche's 1984 Presidential campaign as well as the staff's internal planning measures. As a government witness had testified to the existence and contents of the notebooks, as well as to Steinberg's possession, the court found that the subpoena did not implicate the Fifth Amendment. *Steinberg,* 837 F.2d at 530. In *Clark,* an IRS summons sought accountant's work papers and the personal records that the taxpayer had given his accountant, both of which were known to have subsequently been given to the taxpayer's attorney. Finding the existence of the work papers to be a foregone conclusion, and that the underlying records would be reflected therein, the Tenth Circuit refused to recognize a Fifth Amendment privilege. *See* 847 F.2d at 1472–73. *See also United States v. Stone,* 976 F.2d 909, 911 (4th Cir.1992) (in Department of Energy investigation into relationship between department employees and owner of business receiving DOE contracts, where government knew that appellant owned a beach house and had sufficient knowledge that he rented the house out between 1983 and 1989 to request a list of renters, subpoena seeking utility bills and rental records targets documents whose existence and possession are a foregone conclusion); *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992,* 1 F.3d 87 (2d Cir.1993) (where defendant has testified before SEC as to possession and use of diary, and has previously turned over a copy in which government suspects adulteration, subpoena for original does not implicate Fifth Amendment).

By contrast, those cases in which our sister courts have recognized a Fifth Amendment privilege consistently reveal a gross information asymmetry between the government and the subpoenaed party, which can be bridged only by getting at the contents of the latter's mind. In *United States v. Fox,* 721 F.2d 32 (2d Cir.1983), the IRS issued a wide ranging subpoena seeking an expansive array of personal, financial and business records of Dr. Martin Fox. At the time, the IRS had copies of his 1979–1981 tax returns and a transcript of third-party payments to the Foxes during 1979. Rejecting the government's contention that the testimonial value of producing the subpoenaed documents would be minimal, the court reasoned that in seeking all of the books and records of the Fox's sole proprietorship, the government had attempted "to compensate for its lack of knowledge by requiring Dr. Fox to become the primary informant against himself." *Id.* at 38. Since the IRS could establish neither the existence nor the authenticity of the records sought, its subpoena implicated the Fifth Amendment's protections. *In re Grand Jury Proceedings on February 4, 1982,* 759 F.2d 1418 (9th Cir.1985) involved a similarly broad subpoena, demanding personal journals, files related

to the purchase of fishing boats, stock transactions, and receipts. Reasoning that the production of documents belonging to and prepared by the subpoenaed party would relieve the government of the need to establish their existence, possession and authenticity, the court held that the act of production would be sufficiently testimonial to require protection if incriminating. *See id.* at 1421. Finally, in *In re Grand Jury Proceedings, Subpoenas for Documents*, 41 F.3d 377 (8th Cir.1994), the government subpoenaed all of appellants' original records from any business in which they owned an interest as well as all evidence of their financial transactions for a four-year period. Noting that the subpoena did not describe the requested documents in specific terms, the court found that the government had failed to establish an independent source of authentication. Focusing on the discretionary judgments involved in responding to a subpoena, the court pointedly remarked that "the broader, more general, and subjective the language of the subpoena, the more likely compliance with the subpoena would be testimonial." *Id.* at 380.

Although the fit is by no means perfect, the cases assessing the testimonial value of an act of production form a pattern that correlates strongly with the government's need to draw from the mental faculties of the responding party. Where the information asymmetry is large, and where the government's prior knowledge is minimal, the act of production will likely communicate either the existence, possession or authenticity of the subpoenaed documents.

ii. *Assessing the Government's Knowledge*

The case at bar highlights a further doctrinal ambiguity, which is again tied to elaborating the extent of knowledge that the government must have in order to justify a conclusion that the communicative aspects of the act of production are a "foregone conclusion" under *Fisher* and *Doe I*. Rehearsing an argument discussed above, the Independent Counsel contends that government knowledge of the existence and possession of documents should be assessed solely through examining categories or classes of documents. While it thus argues that the court should measure whether the information sought through a subpoena is a foregone conclusion at a high degree of abstraction—speaking in generalized terms of business, financial and tax records—the Independent Counsel provides no support for its contention. Moreover, any instruction to filter review of the government's knowledge through categories is inherently an empty one, for it fails to address the recurring level of generality problem. *See generally*, Laurence H. Tribe & Michael C. Dorf, *Levels of Generality in the Definition of Rights*, 57 U. CHI. L.REV. 1057 (1990) (discussing the malleability and outcome-determinative nature of levels of generality); *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (discussing the appropriate level of generality at which to define fundamental rights). While a useful method of sorting information, categories do not present themselves as Platonic forms with inherent shape or universal meaning. Rather, defined by reference to their particular applications, they can be abstracted upwards or downwards (through varying levels of generality) in order to embrace or reject concrete instances. *See generally* Ludwig Wittgenstein, *Philosophical Investigations* (G.E.M. Anscombe trans., 3d ed.1968) at §§ 137–242 (general concepts do not dictate their concrete applications, but rather are defined through them). As *Doe I* well illustrates, the government cannot simply subpoena business records and then claim the requisite knowledge for purposes of the Fifth Amendment by pointing to the existence of a business.[33]

---

**33.** Nor can the government obtain documents by compelling their production, and then claim that the act of production was insufficiently communicative to merit the Fifth Amendment's protection because the papers themselves provide independent evidence of their own existence. Where the government had no information as to their potential existence prior to the compelled response, its *a posteriori* knowledge is inextricably linked with the communicative testimony inherent in the subpoena response.

The dissent attempts to differentiate two concepts of existence, only the first of which it claims to be covered by the Fifth Amendment. In the dissent's view, the existence prong of *Fisher* refers only to the statement, made in a given act of

The Independent Counsel's assertion that its knowledge of Hubbell's status as a consultant and a taxpayer carried with it a concomitant awareness of the existence and possession of his consulting and tax records similarly falls short. The Fifth Amendment's proscription against compelled self-incrimination does not hinge on tautology.

The basic problem with the Independent Counsel's contention is that it fails to recognize that there are no essential classes or categories of information. While the Independent Counsel attempts to argue that ordinary business, financial and tax records are the appropriate categories through which to assess Hubbell's act of production, other courts have utilized those terms in a different capacity. The Eighth Circuit in *Rue*, for example, used the term to reference the various paragraphs of the subpoena in question, *see Rue*, 819 F.2d at 1490, while the Sixth Circuit has utilized it as an open-ended de-

vice for classifying different levels of government knowledge. *See Butcher v. Bailey*, 753 F.2d 465, 470 (6th Cir.1985) (inviting the district court to break its assessment of the government's knowledge down into whatever document categories it sees). The level of generality problem arises precisely because these questions "do not lend themselves to categorical answers" and "may instead depend on the facts and circumstances of particular cases or classes thereof." *Fisher*, 425 U.S. at 410, 96 S.Ct. 1569; *Doe I*, 465 U.S. at 613.

 Recognizing that the inquiry will always be highly contextual and fact-intensive, we agree with the Second Circuit that the government must establish its knowledge of the existence, possession, and authenticity of subpoenaed documents with "reasonable particularity" before the communication inherent in the act of production can be considered a foregone conclusion.[34] *See In re Grand Jury*

production, that "Yes, these are the records you described in the subpoena." Dissent at 599. It differentiates this definition of existence from the more sweeping view that connotes "in being," *id.*, claiming that the latter definition is somehow foreclosed by *Schmerber*, *Wade*, and *Gilbert*. The dissent's reading falters on two separate grounds. First, and most important, it is explicitly contradicted by *Fisher*, *Doe I*, and *Braswell*. In each case, the Supreme Court concluded that the act or production "tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It *also* would indicate the taxpayer's belief that the papers are those described in the subpoena." *Fisher*, 425 U.S. at 410, 96 S.Ct. 1569 (emphasis added); *Doe I*, 465 U.S. at 613, 104 S.Ct. 1237; *Braswell*, 487 U.S. at 103, 108 S.Ct. 2284. The statement which follows the word "also" corresponds directly with the dissent's interpretation of the word existence. However, the court states what has become known as the "authenticity" prong separate from its recognition that the act of production communicates the existence of the documents sought in a subpoena. As far as we can tell, our dissenting colleague offers the first opinion attempting to read the existence prong of *Fisher*, reiterated in *Doe I* and *Braswell*, out of existence. We reject this attempt to render an independent part of the *Fisher* analysis redundant.

Ignoring the text of *Fisher*, *Doe I*, and *Braswell*, the dissent seeks support for its parsimonious definition through a misconstruction of *Schmerber*, *Wade*, and *Gilbert*. It argues that existence qua existence "is as 'self-evident' as the blood and its characteristics in *Schmerber*, the voice samples and their characteristics in *Wade*,

and the handwriting and its characteristics in *Gilbert*." Dissent at 599. Our dissenting colleague fails to recognize, however, the legal import of the fact that all humans have blood and that nearly all can speak and write. In each case, the Supreme Court relied upon this self-evident quality to conclude that requiring the accused to provide a sample merely required the use of his body as physical evidence. They were analogous to a "compulsion to submit to fingerprinting, photographing, or measurements ..., to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture," *Schmerber*, 384 U.S. at 764, 86 S.Ct. 1826, because in each case they were considered noncommunicative or insufficiently testimonial. *See* discussion *supra* pp. 573–575. The Supreme Court relied upon this distinction between "compelling 'communications' or 'testimony'" and compulsion that "makes a suspect or accused the source of 'real or physical evidence,'" *id.*, in articulating the communicative elements of the act of production. It concluded that a compelled subpoena response testified to existence qua existence. Accordingly, we refuse to join our dissenting colleague's attempt to overturn the holding articulated in *Fisher*, and reiterated in both *Doe I* and *Braswell*.

**34.** The dissent would discredit our holding by asserting that "the operational meaning of the 'act of production' doctrine in our circuit will largely turn on district courts' discretion in this metaphysical classification of prosecutors' knowledge." Dissent at 601. We do not share the dissent's disdain for factual inquiries into the extent of a government official's knowledge, which forms a large part of ordinary judicial

*Subpoena Duces Tecum,* 1 F.3d 87, 93 (2d Cir.1993). In making this assessment, though, the focus must remain upon the degree to which a subpoena "invades the dignity of the human mind," *Doe II,* 487 U.S. at 219–20 n. 1, 108 S.Ct. 2341 (Stevens, J., dissenting) and on the quantum of information as to the existence, possession, or authenticity of the documents conveyed via the act of production.

In the proceedings below, the court's *Fisher/Doe I* analysis led it to conclude that Hubbell's compelled act of production required him to make communications as to the existence, possession and authenticity of the subpoenaed documents. However, when articulating these factual findings as to the Independent Counsel's knowledge of the documents' existence—as is proper under *Fisher* and *Doe I*—the district court improperly conflated this *Fisher/Doe I* inquiry with the conceptually separate and temporally subsequent *Kastigar* inquiry.[35] *See Hubbell,* 11 F.Supp.2d at 36 ("The assertion of counsel does not begin to show that the independent counsel's knowledge of the documents or their contents was a 'foregone conclusion'"); *id.* at 37 n. 15 ("The 'existence' prong of the *Fisher* analysis goes to the existence of the information contained in the documents, not to the fact that the witness keeps records."). Since the Fifth Amendment only touches the testimonial aspects of a subpoena response, the district court should have independently examined the extent of the government's knowledge as to the

existence, possession or control, and authenticity of the subpoenaed documents—*i.e.,* the testimonial components of the act of production. The inquiry should have focused upon whether the government knew that the documents existed at all, and not upon whether the government knew of the existence of the information contained therein. *See id.* at 35 ("The independent counsel does not claim that he knew *any* of the facts relevant to the charges in this indictment at the time of the subpoena") (emphasis in original). Only the former is communicated through the act of production itself.

As the district court's fact findings relevant to the *Fisher/Doe I* inquiry are inextricably linked with its assessment of the government's substantive knowledge of the alleged offenses, we cannot decide on the record before us whether Hubbell's act of production had sufficient testimonial value to invoke the Fifth Amendment's protections. The subpoena speaks in vague terms, and the detail with which it goes through the possible forms that the information sought could take, *see supra* note 12, at the very least hints that the government had no knowledge as to whether Hubbell maintained comprehensive records of the way he allocated his time. Moreover, it is unclear how the Independent Counsel became apprized of the Pulaski bank account, the three trust accounts, the Bridgeport Group, the check swap, and Hubbell's early withdrawals from his IRA accounts, each of which figure prominently in the indictment.[36] *See* discussion *supra* p. 566. The

decision-making. Under the Fourth Amendment, for example, the probable cause determination with respect to both arrests and searches depends upon an assessment of the government's knowledge as to the likelihood that a suspect has committed a crime or that incriminating items will be in a particular place. Similarly, district judges weigh the validity of a *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1, 21–24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), by assessing whether a police officer had reasonable articulable suspicion that the suspect was potentially involved in criminal activity. A search for weapons incident to a *Terry* stop is also assessed for whether the officer had a reasonable, particularized suspicion that the individual was armed. *See Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ("Reasonable suspicion ... is dependent upon both the content of information possessed by police and its degree of reliability.").

To the extent that any assessment of the government's knowledge requires something in the nature of a "metaphysical classification," we have no doubt that the district courts are up to the task.

35. *Kastigar* is discussed *infra* pp. 582–585.

36. According to the district court, the Independent Counsel conceded in oral argument that it "learned of the Bridgeport Group, the ['for the benefit of'] account at Pulaski County Bank, and the 'pension account check swap' charged in the indictment only through the documents." *Hubbell,* at 35. By contrast, the Independent Counsel asserts that it discovered the account and the check swap through interviews with and documents produced by Michael Schaufele, the Rose Law Firm, and financial institutions. *See* Appellant's Br. at 44–45 n.9. On remand, the Inde-

Bridgeport Group had not been organized, its account at the Pulaski Bank had not been opened, and Hubbell had neither signed a book contract with William Morrow and Company, Inc., nor received his advance on the day the subpoena issued. The extent of the Independent Counsel's knowledge of Hubbell's recordkeeping practices is also uncertain. On remand, the district court should hold a hearing in which it seeks to establish the extent and detail of the government's knowledge of Hubbell's financial affairs (or of the paperwork documenting it) on the day the subpoena issued. It is only then that the court will be in a position to assess the testimonial value of Hubbell's response to the subpoena. Should the Independent Counsel prove capable of demonstrating with reasonable particularity a prior awareness that the exhaustive litany of documents sought in the subpoena existed and were in Hubbell's possession, then the wide distance evidently traveled from the subpoena to the substantive allegations contained in the indictment would be based upon legitimate intermediate steps. To the extent that the information conveyed through Hubbell's compelled act of production provides the necessary linkage, however, the indictment deriving therefrom is tainted.

c. *The Question of Incrimination*

█ Under the third prong of the *Fisher* and *Doe I* analysis, compelled testimony must be incriminating before it merits Fifth Amendment protection. *See Fisher*, 425 U.S. at 409, 96 S.Ct. 1569 ("the privilege protects a person only against being incriminated by his own compelled testimonial communications"). The mere assertion of the privilege by the party whose testimony the government seeks is insufficient; "his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). With respect to a subpoena for documents, the privilege cannot be invoked merely because the subpoenaed items contain incriminating information; the

act of production must communicate and incriminate. *See Fisher*, 425 U.S. at 410, 96 S.Ct. 1569. To have "an incriminating effect," *Doe I*, 465 U.S. at 612, 104 S.Ct. 1237, the party claiming the privilege must be "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Id.* at 614 n. 13, 104 S.Ct. 1237 (citations omitted). *See also Butcher v. Bailey*, 753 F.2d at 470 (showing that document production would incriminate "will be sufficient if the court can, 'by the use of reasonable inference or judicial imagination, conceive a sound basis for a reasonable fear of prosecution' ") (quoting *In re Morganroth*, 718 F.2d 161, 169 (6th Cir.1983)).

Breaking the act of production down into its individual testimonial components, the Independent Counsel argues that an admission of either the existence or possession of "ordinary" business and financial records can almost never be incriminating. Similarly, the implicit authentication of documents would only incriminate were a subpoena to be phrased in such a way as to expressly request production of the instruments of criminality. We disagree, as both logic and Supreme Court precedent rebut the claims of any such niggardly interpretation. First, the Fifth Amendment's protections cannot depend upon such trivial semantic distinctions that the government can sidestep its application by requesting "all income records" instead of "all incriminating income records." Artful phrasing does not suffice. Moreover, *Doe I* and *Doe II* belie such a narrow reading of the Fifth Amendment's protections. In *Doe I*, the Supreme Court found, on the basis of the findings presented, that Doe faced a "real and substantial" risk of incrimination were he to produce the documents sought in the government's subpoena–a subpoena seeking ordinary business records, not "incriminating" business records. *See* 465 U.S. at 614 n. 13, 104 S.Ct. 1237. As the government had no independent knowledge of the existence or his possession of the documents listed in the subpoenas at issue, and since the act of production would tacitly admit their

pendent Counsel bears the "heavy burden" of demonstrating a source of knowledge completely independent from and untainted by the compelled act of production. *See Kastigar*, 406 U.S. at 461–62, 92 S.Ct. 1653; *Braswell*, 487 U.S. at 117, 108 S.Ct. 2284.

existence and his control over them, and provide a source of authentication, the court found the threat of incrimination to be "clear." *See id.* A cursory comparison of the subpoena at issue in *Doe I* with that of the case at bar reveals marked similarities, *see id.* at 607 n. 1, 104 S.Ct. 1237, and we think it equally clear that Hubbell faced a real and substantial threat of incrimination in responding. It is hard to divine another reason why the Independent Counsel would have sought an order of immunity in the first place.

*Doe II's* discussion of the incrimination requirement reinforces our conclusion. Although the decision in *Doe II* turned on the question of whether signing a general release form involved an assertion of fact, the Court also discussed the proper shape of the incrimination inquiry. The *Kastigar* Court, it argued, "implicitly concluded that the privilege prohibits 'the use of compelled testimony, as well as evidence derived directly and indirectly therefrom.' 406 U.S. at 453, 92 S.Ct. 1653. The prohibition of derivative use is an implementation of the 'link in the chain of evidence' theory for invocation of the privilege, pursuant to which the 'compelled testimony' need not itself be incriminating if it would lead to the discovery of incriminating evidence." *Doe II*, 487 U.S. at 208 n. 6, 108 S.Ct. 2341.

In the present case, it appears that Hubbell's testimony likely involved both direct and indirect incrimination. Acknowledging the existence of an interest-bearing checking account the income from which the subpoenaed party had failed to report on his tax returns would directly incriminate; it would inform the government of a known source of unreported income. *See United States v. Argomaniz*, 925 F.2d 1349, 1354 (11th Cir. 1991) (where defendant failed to file tax returns for a series of years, admitting the existence of documents relating to income through production would establish essential elements of criminal failure to file a tax return). If Hubbell had records of that account in his possession or control, that fact could further incriminate. *See Smith v. Richert*, 35 F.3d 300, 304 (7th Cir.1994) (as the mere turning over of 1099s and W–2s in response to a subpoena could eliminate defense of lack of knowledge or possession, it is incriminating). Similarly, in acknowledging the existence of the Bridgeport Group and its bank account at Pulaski Bank, Hubbell provided a link in the chain of evidence used by the Independent Counsel to substantiate the criminal charges against him—an instance of indirect incrimination.

Given the procedural posture of this case, it would be premature for us to review the incrimination question any further at this juncture. Until the district court determines on remand precisely what testimony Hubbell provided through his act of production, focusing on the extent of the government's knowledge as of the date of the subpoena and on whether Hubbell's testimony added "to the sum total of the government's case against him," *United States v. Edgerton*, 734 F.2d 913, 921 (2d Cir.1984) (quoting *Fisher*, 425 U.S. at 411, 96 S.Ct. 1569), it cannot make the appropriate fact findings as to what extent that testimony is incriminating. *See Doe I*, 465 U.S. at 614, 104 S.Ct. 1237 (whether a compelled act of production is incriminating is a question of fact). In conducting this inquiry, the district court should be guided, as the Supreme Court counseled in *Hoffman v. United States*, 341 U.S. at 487, 71 S.Ct. 814, by its particular perceptions of the specific and unique facts of the case.

#### d. *The Upshot of Immunity*

■ A grant of statutory immunity under 18 U.S.C. §§ 6002, 6003, extends as far as the Fifth Amendment privilege it supplants. It "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege," and is "coextensive" with the Fifth Amendment's protections. *Kastigar*, 406 U.S. at 462, 92 S.Ct. 1653. Since the district court erred in assessing the testimonial value of Hubbell's document production, it conducted its inquiry into the effect of Hubbell's statutory immunity against a faulty backdrop. On remand, the court should assess the impact of the immunity order in light of its new fact findings with respect to the government's prior knowledge and the quantum of information it extracted

from "the state of mind, memory, perception, or cognition of the witness." *Braswell*, 487 U.S. at 126, 108 S.Ct. 2284 (Kennedy, J., dissenting). Although this inquiry will be fact-intensive, the district court should bear in mind *Kastigar*'s teaching that "a grant of immunity must afford protection commensurate with that afforded by the privilege, [although] it need not be broader." 406 U.S. at 453, 92 S.Ct. 1653. The precise contours of Hubbell's Fifth Amendment rights, therefore, will be dispositive.

Intervening in this case, the United States, acting through the Attorney General, has proffered a particular reading of the Fifth Amendment's intersection with compelled production which we believe merits some discussion. Like the Independent Counsel, the United States draws a sharp distinction between the testimonial components of the act of production and the contents of those documents, essentially ruling out the possibility that the prohibition on the direct or indirect use of a party's compelled testimony could extend to reach the contents of the documents he turns over. Instead, it invites the court to compare what the government learns from the act of production with what it would know if the documents in question just appeared on its doorstep. That intellectual exercise, it argues, separates the information conveyed through the act of production with what could be deciphered from the records themselves. *See* Intervenor's Br. at 42; Dissent at 602. Since *Kastigar* instructs that the government can introduce the fruits of immunized testimony provided that it can meet "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources," 406 U.S. at 461–62, 92 S.Ct. 1653, the documents themselves can serve as that independent source of the information communicated by their production. Provided that the government does not mention the mechanics through which it obtained those documents, and that the documents are sufficiently self-

explanatory and self-referential to establish their own nexus with the defendant, the government would be free to use the subpoenaed documents in making its case against the defendant.[37] We disagree.

Although the *Fisher* Court observed that "[t]he 'implicit authentication' rationale appears to be the prevailing justification for the Fifth Amendment's application to documentary subpoenas," 425 U.S. at 412 n. 12, 96 S.Ct. 1569, the Court explicitly and repeatedly acknowledged that the act of production also communicates existence and possession. *See id.* at 412, 96 S.Ct. 1569; *Doe I*, 465 U.S. at 613, 104 S.Ct. 1237; *Doe II*, 487 U.S. at 209, 108 S.Ct. 2341; *Braswell*, 487 U.S. at 103, 108 S.Ct. 2284. The analytic tool offered by the United States, however, reads both of these testimonial components out of existence. While the government may be able to establish the authenticity of the documents independently, whether in terms of their own self-reference or the testimony of a witness familiar with them, the magical appearance of the documents obviates the need for prior knowledge that the documents actually exist. Yet "*Kastigar* does not prohibit simply 'a whole lot of use,' or 'excessive use,' or 'primary use' of compelled testimony. It prohibits '*any* use,' direct or indirect." *United States v. North*, 910 F.2d 843, 861 (D.C.Cir. 1990). Once the documents appear and are examined, such that their existence enters the consciousness of the prosecutor, the United States has offered no means through which the government can establish that its evidence "is not directly or *indirectly* derived from such testimony" as to their existence. *United States v. North*, 920 F.2d 940, 946 (D.C.Cir.1990) (emphasis in original).

The intellectual exercise suggested by the Justice Department and embraced by our dissenting colleague, *see* Dissent at 602, essentially eviscerates the act of production doctrine, as well as the Fifth Amendment protection it secures. To offer a counter-hypothetical, assume that the government

---

**37.** The Independent Counsel has made a similar argument, claiming that it has not and will not trample Hubbell's Fifth Amendment rights because it has no need to introduce Hubbell's actual documents at trial. Accordingly, the Independent Counsel asserts that it can obviate Hubbell's testimony as to the existence, possession, control, and authenticity of the subpoenaed documents. *See* Appellant's Br. at 12 ("the government has made no use of Mr. Hubbell's act of production in the course of developing the charges in the indictment.").

grants immunity to a murder suspect, compelling him to incriminate himself verbally. Under compulsion, the accused admits that he stabbed the victim, and that he buried the murder weapon in a particular place that would not have been discovered through any alternative line of government investigation. When the police go to this remote location, they find a knife. Forensic testing reveals it not only to be the murder weapon, but also to contain blood stains and a set of fingerprints that match our suspect's. Would we allow a prosecution to be based on the incriminating knife, under our colleague's "manna from heaven" scenario, by assuming that it miraculously appeared in the district attorney's office? Could it be used as evidence so long as no-one testified as to how they learned of its whereabouts? Once the accused has already directed the government to the knife, should we limit his Fifth Amendment privilege by hypothesizing after the fact—as an intellectual exercise—that the knife could have been linked to the accused because of the blood or fingerprints on it, or because the prosecutor conceivably could have received an anonymous report describing the location of the weapon? Could the prosecutor, consistent with the Fifth Amendment, bring charges based upon any independent linkage between the weapon and the accused that it can divine after the fact? The questions answer themselves. They also rebut the theory of the act of production doctrine proffered by the Justice Department and the dissent. Since the Self–Incrimination Clause has always been understood to refer to testimony in all of its forms, whether communicated by voice or through physical acts, see *Doe II*, 487 U.S. at 209–10 n. 8, 108 S.Ct. 2341 ("Petitioner has articulated no cogent argument as to why the 'testimonial' requirement should have one meaning in the context of acts, and another meaning in the context of verbal statements."); *Muniz*, 496 U.S. at 595 n. 9, 110 S.Ct. 2638 (definition of testimonial communication "applies to both verbal and nonverbal conduct"), the protection it accords to verbal communications must extend to the testimony conveyed through a compelled act of production.[38]

Now suppose a variation of our hypothetical, in which the police discover a victim's body in the basement of a large apartment building, and an autopsy establishes stabbing to be the cause of death. Lacking any clues, a grand jury issues a subpoena to every resident in the building, asking each to produce "all knives and other forms of cutlery that are now, or in the preceding month have been, in your possession or control." The residents object *en masse*, asserting *inter alia* their Fifth Amendment privilege against self-incrimination. After the prosecutor obtains an order compelling production and granting immunity to the maximum extent allowed by law, the residents comply with the subpoena. Among the recovered knives, the police discover the murder weapon. The prosecutor indicts its owner for murder. The defendant moves to dismiss the indictment, claiming that his immunized subpoena response testified as to the existence, his possession, and the authenticity of the knife he produced. Having handed the government the murder weapon, and provided the explicit link between it and himself, can the accused nevertheless be prosecuted consistent with the Fifth Amendment provided that the government finds some independent way to link him with the knife? If our protagonist has once again left behind fingerprints and traces of his blood, could they be used as evidence, together with the knife, so long as no one testified as to the means of recovery? In the scenario we paint, where the government had no evidentiary knowledge independent of that derived, directly and indirectly, from testimony communicated through compelled production, *Fisher, Doe I, Doe II, Kastigar* and *Braswell* clearly repudiate any attempt to do so. They collectively teach

---

**38.** Our dissenting colleague recognizes that the weapon is the tainted fruit of immunized oral testimony, *see* Dissent at 602, the inevitable conclusion under settled law that we constructed our hypothetical to reflect. The taint remains, however, regardless of whether the knife can be independently linked back to the accused by some stretch of the imagination. The dissent's *post hoc* "manna from heaven" scenario cannot purge it. Where the government makes the same use of compelled document production, depending on the facts and circumstances of the particular case, those documents can be equally tainted.

that the scope of the Fifth Amendment's protection cannot be measured by merely imagining that our knife appeared, like manna from heaven, in the grand jury room.

██ In a case such as the present one, in which the government's knowledge of the existence or possession of the extensive documentation sought via subpoena appears scant at best, the United States' hypothetical about finding the papers on its doorstep fails to capture the true nature of the Fifth Amendment's protection against the government probing the mind of an accused in order to ascertain evidence it can use to convict him. Where the testimonial value of document production is high, and the government obtains a large quantum of information directly from the witness' mental faculties, the government labors under "a heavy burden of proving that all evidence it seeks to introduce is untainted by the immunized act of production." *In re Sealed Case*, 791 F.2d 179, 182 (D.C.Cir.1986) (internal citations omitted). If the government did not have a reasonably particular knowledge of subpoenaed documents' actual existence, let alone their possession by the subpoenaed party, and cannot prove knowledge of their existence through any independent means, *Kastigar* forbids the derivative use of the information contained therein against the immunized party. *See* 406 U.S. at 453, 92 S.Ct. 1653 ("Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, ... prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness."). Accordingly, should the Independent Counsel prove unable to meet the requisite evidentiary burden, the contents of those documents will be inadmissible. *See Sealed Case*, 791 F.2d at 182 ("Thus, if in fact appellee's privilege in the act of production cannot be protected without excluding the contents of the tapes (a point on which we express no opinion) the District Court has the authority to prevent the government from referring to or introducing those contents.").

"The decision to seek use immunity necessarily involves a balancing of the Government's interest in obtaining information against the risk that immunity will frustrate the Government's attempts to prosecute the subject of the investigation." *Doe I*, 465 U.S. at 616, 104 S.Ct. 1237. Unless the Independent Counsel can establish its knowledge of the existence and possession of the documents sought in the subpoena with greater detail and particularity, it will have to live with the consequences of its decision to compel production.

### III. CONCLUSION

For the reasons above, we vacate the district court's judgment and remand for further proceedings in light of this decision.

*So ordered.*

WALD, *Circuit Judge*, concurring in Part I:

I believe that a reasonable construction of the original mandate shows that it is "demonstrably related" to the tax evasion and asset concealment prosecutions in dispute here. That, however, is only because, as the panel opinion makes clear, at least some of the consulting monies Hubbell received in the years 1994–1997 may have been tainted as hush money. "The timing, sources, and extent of the payments make the belief that they were hush money reasonable." Panel Opinion ("Panel Op.") at 20. Thus, manipulation of all monies received during that period may have been related to the concealment of any tainted money—money, that is, received in return for obstructing the Independent Counsel's Whitewater investigation. Panel Op. at 15–18. In the face of these circumstances, I disagree with the dissent's conclusion that the Independent Counsel's failure to bring an indictment on the hush money allegations, either first or contemporaneous with the tax violations, means that no "credible evidence" of any wrongdoing exists. Dissenting Opinion ("Diss. Op.") at 594–595.

The simple fact that no prior or simultaneous indictment for obstruction was brought down specifically alleging that monies were received as a *quid pro quo* for noncooperation in the main Whitewater mat-

ter does not compel a conclusion that the tax evasion and asset concealment charges are not related to the original subject matter. It would, in my view, be unreasonable to require the Independent Counsel to bring authorized prosecutions in any special order or sequence provided that they are undertaken and continued only so long as the "relatedness" requirement remains satisfied. I believe such a standard may be inferable from the panel opinion, Panel Op. at 18, but I wish to make clear here my own view that at the point that the Independent Counsel is no longer diligently pursuing his investigation of the main allegation that money was channeled to Hubbell for noncooperation or misleading testimony, with a reasonable expectation that it will prove fruitful, the other ancillary claims of manipulation or failure to report taxes cease to be "demonstrably related" to the original mandate. It is not enough that the Independent Counsel could at one time state a reasonable belief that the underlying obstruction allegations were true. In my view, the underlying investigation into the hush money charge must have been ongoing, and there must have been credible evidence that the underlying offense did indeed occur at the time the ancillary indictment was filed. To the extent that prosecution for the obstruction offense was not practicable at the time of the tax indictments, whether because the main investigation had yet to be completed, or because the Independent Counsel believed that evidentiary problems limited the prospects of ob-

taining a conviction on the obstruction offense at that moment, the Independent Counsel would still have jurisdiction over the ancillary charges, provided that credible evidence remained to substantiate its belief that the obstruction crime had been committed. However, if at some point during the investigation it becomes apparent that this belief is unfounded, then at that time the ancillary counts should be passed over to the Justice Department to screen and, if appropriate, to prosecute. That does not, however, appear to be the case here—we were assured at oral argument by the Independent Counsel himself that the main hush money investigation was not closed, and if there is any reason to believe that it is a dead letter at the time the indictment for ancillary tax matters was brought (or even when it is reinstated on remand here), then a hearing (*in camera* if necessary) by the district judge on the issue would be appropriate. But assuming, as we must on the record before us, that the principal investigation into possible obstruction was alive at the time the ancillary tax indictments were brought and remains so, I cannot but conclude that the tax indictments were related to the main endeavor for the reasons set out in the panel opinion.[1] Panel Op. at 15–18.

Finally, while I do believe that some deference is due the Special Division's interpretation of these prosecutions as related to the original one, I would not find it necessary under the facts here to decide if the appro-

---

**1.** Although the dissent challenges the notion that these tax evasion indictments would have been proper even if there had been a simultaneous prosecution for taking hush money, *but see* Oral Arg. Tr. at 41, 43–44 (defense counsel endorsing simultaneous prosecution), I do not see how that argument can be maintained. The original mandate, as required by 28 U.S.C. § 593(b)(3), granted the Independent Counsel jurisdiction to investigate and prosecute obstruction of its primary investigation. When inquiring into whether Hubbell had received hush money in return for noncooperation, the Independent Counsel had jurisdiction to investigate the likely concealment of any such payments. As tax evasion constitutes a logical part of any effort to evade the detection of illicit funds, the Independent Counsel legitimately focused his attention in that direction. Whatever Hubbell's subjective motivation for not reporting income might have been, tax evasion is an inherently concealing activity.

To the extent that Hubbell failed to report consulting fees alleged to be hush money, he obstructed the obstruction investigation. Provided that the underlying investigation was still actively being pursued, the Independent Counsel accordingly had jurisdiction to investigate and prosecute Hubbell's acts of concealment.

The dissent suggests, however, that this court, in order to assure that the Independent Counsel's investigation had actually unearthed evidence of obstruction, should have taken up the Independent Counsel's proffer to view evidence relating to the "hush money" allegations *in camera.* Diss. Op. at 595. Aside from the fact that one of the defense counsel explicitly denounced such a course at oral argument, *see* Oral Arg. Tr. at 41, that inquiry would be more appropriately conducted by the district court when adjudicating a motion to dismiss the indictment for unrelatedness on this ground.

priate level of deference is substantial, Panel Op. at 7, or only due deference. I do not find the agency analogy particularly persuasive, but on the other hand I believe that the responsibilities of the Special Division under the statute to define the Independent Counsel's jurisdiction initially, and subsequently to assess requests for the referral of related matters, strongly militate toward some deference; the degree of deference due will likely depend on the circumstances of each case. The extent of that deference might shift according to whether the Special Division's relatedness determination is grounded particularly on facts made known to it by the Independent Counsel or the Attorney General or on a legal or conceptual conclusion that the offenses or persons are sufficiently related to the original mandate. At any rate, I think the relatedness requirement is satisfied here under either standard of deference.

TATEL, *Circuit Judge*, dissenting from Part I:

This court today concludes that the indictment of Webster Hubbell for failing to pay taxes on income earned in Washington, D.C., in 1994 "arises out of" or "relates to" the Independent Counsel's investigation of various Arkansas land transactions in the mid–1980s known as Whitewater. Because this result expands independent counsel authority at the expense of the Executive Branch, I believe it violates the constitutional principle of separation of powers. By deferring to the Special Division and by adopting virtually limitless theories of "relatedness," the court fails to police the boundaries that *Morrison v. Olson* deemed essential to the constitutionality of the independent counsel statute. *See* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). Mindful of these boundaries, which guarantee political accountability for the prosecutorial function, and of "the duty of federal courts to construe a statute in order to save it from constitutional infirmities," *id.* at 682, 108 S.Ct. 2597, I would find that the tax indictment is not "demonstrably related to the factual circumstances that gave rise to the Attorney General's ... request for the appointment of the independent counsel," *id.* at 679, 108 S.Ct. 2597. I would therefore affirm the district court's order quashing the indictment.

I

Vesting the executive power in the President of the United States, the Constitution directs that "he shall take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. To aid in this task, Congress specifically delegated to the Attorney General and her subordinates in the Department of Justice the power to "conduct any kind of legal proceeding, civil or criminal," 28 U.S.C. § 515(a) (1994); *see id.* § 516, including the prosecution of tax crimes, *see* 28 C.F.R. § 0.70 (1998).

The Ethics in Government Act of 1978 carved a narrow exception to the Attorney General's power to enforce federal criminal law. In the wake of the "extraordinary sequence of events" of the Watergate scandal—in particular, the firing of special prosecutor Archibald Cox—Congress saw the need for "the appointment of an independent temporary special prosecutor for certain limited cases where the Department of Justice may have a conflict or interest with respect to a particular investigation." S.REP. No. 95–170, at 6, 34 (1977), *reprinted in* 1978 U.S.C.C.A.N. 4216, 4222, 4250. Aware of the constitutional implications of creating an independent prosecutorial function outside the Executive Branch, Congress adopted an elaborate array of procedures controlling the appointment, powers, and jurisdiction of independent counsel. *See* 28 U.S.C. §§ 592–596. Independent counsel may be removed by the Attorney General for "good cause," may perform only certain limited duties, and may act only within the scope of prosecutorial jurisdiction ceded by the Attorney General. *See* S.REP. No. 95–170, at 56, 1978 U.S.C.C.A.N. at 4272 ("The prosecutorial jurisdiction of the special prosecutor is one of the most important devices for the control ... and the accountability of such a special prosecutor."). Absent expansion by the Attorney General under 28 U.S.C. § 593(c), the jurisdiction of an independent counsel is limited to matters related to the Attorney General's original request for appointment of an

independent counsel under 28 U.S.C. § 592(d).

In *Morrison,* the Supreme Court found these constraints essential to the statute's constitutionality. Without them, the Court could not have characterized the independent counsel as an "inferior officer" under the Appointments Clause of the Constitution. *See* 487 U.S. at 670–77, 108 S.Ct. 2597. Once an independent counsel investigates or prosecutes matters beyond the jurisdiction ceded by the Attorney General, the independent counsel sheds his "inferior" status and becomes a "principal officer" requiring Presidential appointment and Senate confirmation. *See Buckley v. Valeo,* 424 U.S. 1, 132, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Although "the power to appoint inferior officers such as independent counsel is not in itself an 'executive' function in the constitutional sense," *Morrison,* 487 U.S. at 695, 108 S.Ct. 2597, the power to appoint principal officers surely is. *See* U.S. Const. art. II, § 2, cl. 2. For that reason, the *Morrison* Court thought it constitutionally important that "the jurisdiction of the independent counsel is defined *with reference to the facts submitted by the Attorney General*" and that "the Act [28 U.S.C. § 594(f) ] requires that the counsel abide by Justice Department policy unless it is not 'possible' to do so." 487 U.S. at 696, 108 S.Ct. 2597 (emphasis added). These limitations, among others, "give the Executive Branch sufficient control over the independent counsel," *id.,* and ensure that the Act does not " 'impermissibly undermine[ ]' the powers of the Executive Branch," *id.* at 695, 108 S.Ct. 2597 (citation omitted). An independent counsel who exceeds the jurisdiction conferred by the Attorney General usurps the President's constitutional power to maintain control of the inherently "executive" function of law enforcement. *See id.* at 691, 694, 108 S.Ct. 2597.

*Morrison* expressed similar constitutional concerns about the role of the Special Division of this court. The statute allows the Special Division to appoint an independent counsel only after the Attorney General makes a preliminary investigation, determines that further investigation is warranted,

prescribes a subject matter for investigation and potential prosecution, and "applies" to the Special Division for an appointment. *See* 28 U.S.C. §§ 592(c)-(d), 593(b). In defining an independent counsel's prosecutorial jurisdiction, the Special Division has only one function:

> [to] assure that the independent counsel has adequate authority to fully investigate and prosecute the subject matter with respect to which the Attorney General has requested the appointment of the independent counsel, and all matters related to that subject matter. Such jurisdiction shall also include the authority to investigate and prosecute Federal crimes ... that may arise out of the investigation or prosecution of the matter with respect to which the Attorney General's request was made, including perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses.

*Id.* § 593(b)(3). Describing the Special Division's power to define jurisdiction as "incidental" to its power to appoint, *Morrison* made clear that the Special Division's authority is quite limited:

> [Congress] may vest the power to define the scope of the office in the [Special Division] as an incident to the appointment of the officer pursuant to the Appointments Clause. That said, we do not think that Congress may give the Division *unlimited* discretion to determine the independent counsel's jurisdiction. In order for the Division's definition of the counsel's jurisdiction to be truly "incidental" to its power to appoint, the jurisdiction that the court decides upon must be *demonstrably related to the factual circumstances that gave rise to the Attorney General's investigation and request for the appointment of the independent counsel in the particular case.*

487 U.S. at 679, 108 S.Ct. 2597 (second emphasis added). To be sure, the statute also provides that the Special Division may, upon a request by an independent counsel, "refer to the independent counsel matters related to the independent counsel's prosecutorial jurisdiction." 28 U.S.C. § 594(e). But *Morrison* left no doubt that referrals may not expand

the original scope of an independent counsel's jurisdiction. *See* 487 U.S. at 680 n. 18, 108 S.Ct. 2597. Consistent with the separation of powers principle, only the Attorney General may expand an independent counsel's prosecutorial jurisdiction. *See* 28 U.S.C. § 593(c).

Thus, the Attorney General's "initial suggestion of jurisdiction," Majority Opinion ("Maj. Op.") at 557—or more precisely, as *Morrison* put it, "the factual circumstances that gave rise to the Attorney General's investigation and request for the appointment of the independent counsel," 487 U.S. at 679, 108 S.Ct. 2597—serves as the ultimate baseline for assessing the legality of any definition of jurisdiction by the Special Division as well as any exercise of authority by an independent counsel. Constitutionally required, this baseline reconciles the principle of separation of powers with the vesting of prosecutorial authority in an official independent of the Executive Branch. *See id.*

## II

In her June 30, 1994 application to the Special Division, the Attorney General prescribed the subject matter of the Independent Counsel's jurisdiction as follows:

> whether any individuals or entities have committed a violation of any federal criminal law, ... relating in any way to James B. McDougal's, President William Jefferson Clinton's, or Mrs. Hillary Rodham Clinton's relationships with Madison Guaranty Savings & Loan Association, Whitewater Development Corporation, or Capital Management Services, Inc.

Application for Appointment of Independent Counsel, *In re Madison Guar. Sav. & Loan Ass'n* (June 30, 1994). The application also authorized prosecution of any conduct obstructing the investigation of this core subject matter. *See id.* Exercising its power under 28 U.S.C. § 593(b)(1), the Special Division on August 1, 1994 appointed Kenneth W. Starr as independent counsel and granted him prosecutorial jurisdiction over matters set forth in the Attorney General's application. *See* Maj. Op. at 554–555 (describing the Special Division's original grant of jurisdiction). Responding to subsequent requests

from the Independent Counsel, the Special Division twice exercised its referral power under 28 U.S.C. § 594(e). *See* Maj. Op. at 555–556 (describing the September 1, 1994 and January 6, 1998 referrals).

The second referral arose from an application in which the Independent Counsel stated:

> In the course of its investigation, this Office received information regarding payments to Mr. Hubbell from individuals and entities associated with the Clinton Administration. These payments were made starting in 1994, when Mr. Hubbell was publicly known to be under criminal investigation. This Office initiated a preliminary investigation into whether these payments might be related to Mr. Hubbell's unwillingness to cooperate fully with the investigation, as his plea agreement obligated him to do. The grand jury has heard evidence related to the payments, including evidence that Mr. Hubbell may have committed fraud and tax crimes in connection with them.

Application for Order of Referral, *In re Madison Guar. Sav. & Loan Ass'n* (Dec. 31, 1997), at 3–4. In response, the Special Division's referral authorized investigation and prosecution of crimes, including tax offenses, associated with Hubbell's income since 1994, as well as other crimes such as obstruction of justice and perjury "related to payments that Mr. Hubbell has received from various individuals and entities" since 1994. Order Granting Application for Order of Referral, *In re Madison Guar. Sav. & Loan Ass'n* (Spec. Div. D.C.Cir. Jan. 6, 1998). The Independent Counsel then brought a 10–count, 42–page indictment detailing an elaborate tax evasion scheme allegedly undertaken by Hubbell and his wife, along with their lawyer and accountant.

We now face the following question: Under sections 593(b)(3) and 594(e) of the Ethics in Government Act, does this indictment "arise out of" or "relate[ ] to" the original scope of the Independent Counsel's prosecutorial jurisdiction? To answer this question, we must evaluate the indictment not against the two referrals by the Special Division—those *referrals* could not have expanded the

original scope of the Independent Counsel's jurisdiction, *see Morrison*, 487 U.S. at 680 n. 18, 108 S.Ct. 2597—but against the Special Division's original August 5, 1994 grant of authority. Given *Morrison*'s constitutional limitation on the Special Division's power to define independent counsel jurisdiction, *see id.* at 679, 108 S.Ct. 2597, the precise question before us is this: Is the indictment of Hubbell for tax evasion "demonstrably related to the factual circumstances that gave rise to the Attorney General's investigation and request for the appointment of the independent counsel"?

Before addressing this issue, this court holds that the Special Division's January 1998 referral is entitled to deference—"substantial" deference, according to Judge Williams; at least "due" deference, according to Judge Wald. Either way, I disagree.

At the outset, I think it important to clarify that, as a procedural matter, we are not directly reviewing the Special Division's referral. The statute nowhere authorizes appeals from Special Division referrals. Courts of appeals and the Special Division play different institutional roles under the independent counsel statute. They act at different stages of the investigation, and they have different documents before them. Although the Special Division made an implicit determination of "relatedness" in its referral, it did so in the context of a request for investigative and prosecutorial authority. That investigation has now progressed beyond mere allegations and has evolved into an indictment. Our task, like the district court's before us, is to resolve a specific dispute whose parameters have crystallized: We must decide whether the April 30, 1998 indictment, in all its concreteness and particularity, is "related to" the original scope of the Independent Counsel's prosecutorial jurisdiction. The Special Division did not resolve this question, nor could it.

In support of giving the referral deference, Judge Williams accepts the view that the Special Division "act[ed] quite like [an agency] glossing its own regulation" when it exercised its referral power. Maj. Op. at 557. However, the Special Division possesses none of the characteristics of agencies that entitle their legal judgments to judicial deference. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 865, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In making "related to" determinations, the Special Division exercises no special or technical expertise that circuit and district courts lack. The Special Division has no political accountability through either executive or congressional oversight, and its members are neither appointed by the President nor confirmed · by the Senate for their role. No provision of law allows for direct judicial review of its decisions. Unlike administrative agencies—and unlike even the U.S. Sentencing Commission, *see* 28 U.S.C. §§ 991(b), 994–995—the Special Division exercises no congressionally-delegated policymaking responsibilities. This last fact alone undermines the agency analogy, for "the power authoritatively to interpret its own regulations is a component of the agency's *delegated lawmaking powers*." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (emphasis added), *quoted in* Maj. Op. at 558.

*Morrison* left no doubt that in both form and function, the Special Division is a *court*, not an agency. The opinion consistently refers to the Special Division as a "court": "The court consists of three circuit court judges or justices appointed by the Chief Justice of the United States," 487 U.S. at 661 n. 3, 108 S.Ct. 2597; "we do not think it impermissible for Congress to vest the power to appoint independent counsel in a specially created federal court," *id.* at 676, 108 S.Ct. 2597; "there is no risk of partisan or biased adjudication of claims regarding the independent counsel by that court," *id.* at 683, 108 S.Ct. 2597; "once the court has appointed a counsel and defined his or her jurisdiction, it has no power to supervise or control the activities of the counsel," *id.* at 695, 108 S.Ct. 2597. Were this language not clear enough, *Morrison* explicitly held that the Special Division's functions fall within the range of powers assigned to federal courts by the Appointments Clause, *see id.* at 673–77, 108 S.Ct. 2597, and by Article III, *see id.* at 677–85, 108 S.Ct. 2597.

*Morrison* also acknowledged that the Special Division functions in a judicial capacity when exercising its referral power. Observing that "in order to decide whether to refer a matter to the counsel, the court must be able to determine whether the matter falls within the scope of the original grant," the Supreme Court said that the referral power involves "the power to *'reinterpret'* or *clarify* the original grant." *Id.* at 685 n. 22, 108 S.Ct. 2597 (emphasis added); *see also In re Espy,* 80 F.3d 501, 507 (D.C.Cir.1996) ("In referring a related matter, this court is interpreting, but not expanding, the independent counsel's original prosecutorial jurisdiction...."). In other words, the referral function requires the Special Division to decide a *legal question*—i.e., whether the matters contained in an independent counsel's request for referral are "related to" the original jurisdictional grant. *See id.* at 507–09; *In re Olson,* 818 F.2d 34, 47–48 (D.C.Cir. 1987). Answering this question calls on the Special Division—whether explicitly (as in *Espy*) or implicitly (as in this case)—to develop and apply a theory of "relatedness" consistent with the independent counsel statute and the Constitution.

Because the Special Division's January 1998 "related to" determination amounts to a legal judgment, we owe it no deference. We typically apply de novo review to decisions of other courts (except the Supreme Court) on questions of federal law, *see Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (questions of law must be resolved de novo on appeal), and "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable," *Salve Regina College v. Russell,* 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). No one contends that the Special Division, as part of the D.C. Circuit, creates binding circuit precedent through its decisions. In relation to this court, the Special Division's legal determinations resemble those of our sister circuits, whose conclusions of law we review neither directly nor deferentially.

Acknowledging that referrals could be characterized as judicial acts, Judge Williams says that referrals most closely resemble the issuance of search warrants by federal mag-

istrates or state judges, whose determinations of probable cause, "[a]lthough made ex parte and resolving constitutional questions," are accorded " 'great deference' " under settled law. Maj. Op. at 559 (citing *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). In *Gates,* however, the Supreme Court made clear that the deferential standard of appellate review applicable to search warrants stems directly from the intensely fact-bound nature of an issuing magistrate's probable-cause determination. *See* 462 U.S. at 232, 103 S.Ct. 2317 ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."); *id.* at 241, 103 S.Ct. 2317 ("[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' ") (citation omitted). Unlike a magistrate, the Special Division does not "make a practical, common-sense decision" about probabilities when it considers requests for referrals. *Id.* at 238, 103 S.Ct. 2317. Rather, it compares two legal documents—the independent counsel's referral request and the original grant of prosecutorial jurisdiction—and then determines whether the former is "related to" the latter within the meaning of the statute. Like a court evaluating a complaint on a motion to dismiss, the Special Division finds no facts, weighs no evidence, and makes no credibility determinations. It simply decides a question of law. Given the interpretive nature of this task, deference cannot be justified on the grounds "that the [Special Division] is 'better positioned' than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Salve Regina College,* 499 U.S. at 233, 111 S.Ct. 1217.

It is true that a referral under the independent counsel statute presents a situation "[w]here ... the relevant legal principle can be given meaning only through its application to the particular circumstances of a case." *Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). But the Supreme Court has directed that in such situa-

tions a federal appellate court must retain "its primary function as an expositor of law." *Id.* De novo appellate review is particularly important where, as here, the relevant legal principle has constitutional dimensions. *See, e.g., Thompson v. Keohane,* 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (requiring federal habeas court to review de novo whether suspect was "in custody" at time of interrogation for purposes of *Miranda*); *Miller,* 474 U.S. at 112, 106 S.Ct. 445 (requiring "independent federal determination" of the voluntariness of a confession).

I disagree that referrals will have no real function under the statute unless we defer to the Special Division. *See* Maj. Op. at 559. For one thing, the Special Division's referral authority provides independent counsel, sensitive to both the limitations on their office and the ethic of self-restraint honored by federal prosecutors, with an avenue for seeking independent and impartial confirmation of their authority. Immune from direct judicial review, a referral gives legitimacy to an independent counsel's investigation even if a federal court later determines that a specific indictment exceeds the prosecutor's jurisdiction. This legitimacy provides a level of protection against any attempt by the Attorney General to remove or by Congress to impeach an independent counsel on the ground that he has overstepped his authority. *See* 28 U.S.C. § 596(a)(1). The referral process also empowers the Special Division to enforce the boundaries of independent counsel jurisdiction. Where the Special Division rejects a request for referral, only the most zealous and imprudent prosecutor would pursue matters covered by the rejected application. Far from existing "simply to relieve the solitude of the Independent Counsel's office," Maj. Op. at 559, the referral power thus serves important functions under the statutory scheme, constraining independent counsel when they near the limit of their authority and safeguarding their political independence if their investigative authority is challenged.

For all of these reasons, I would hold that this court owes no deference to the Special Division's "related to" determination. In as-

sessing the legality of this tax indictment, our review should be de novo.

### III

This court's conclusion that the Independent Counsel has authority to proceed with this indictment stems from its view, flawed in my judgment, that we would "undercut" *Morrison* were we to construe the independent counsel statute in ways "that prevent this Independent Counsel from performing his duty in a manner reasonably approximating that of an ordinary prosecutor." Maj. Op. at 563. Insisting on affording the Independent Counsel the same "leeway," *id.* at 561, given to "every other prosecutor," *id.* at 563, the court ignores the basic premise critical to the constitutionality of the statute: Independent counsel do not and cannot have the powers of ordinary prosecutors. If they did, the office would " 'impermissibly undermine[ ]' the powers of the Executive Branch." *Morrison,* 487 U.S. at 695, 108 S.Ct. 2597 (citation omitted). Among other constraints, it is the limited jurisdiction of independent counsel that "give[s] the Executive Branch sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." *Id.* at 696, 108 S.Ct. 2597. That an ordinary federal prosecutor might have authority to indict Hubbell for tax evasion therefore tells us nothing about whether this Independent Counsel—constrained by the statute and the separation of powers principle—may bring the same indictment. Nor do we learn anything from the authority possessed by the Watergate Special Prosecutor, *see* Maj. Op. at 561–562, for the full scope of his authority flowed directly from the Attorney General, thus presenting no separation of powers concerns.

Reviewing the record de novo, I would find that the indictment of Hubbell for tax evasion was not "demonstrably related to the factual circumstances that gave rise to the Attorney General's investigation and request for the appointment of the independent counsel." *Morrison,* 487 U.S. at 679, 108 S.Ct. 2597. Hubbell's alleged failure to pay taxes on fees for work from 1994 to 1997 in Washington, D.C., is *unrelated* to whether, almost

a decade earlier in Little Rock, Arkansas, "any individuals or entities have committed a violation of any federal criminal law ... relating in any way to James B. McDougal's, President William Jefferson Clinton's, or Mrs. Hillary Rodham Clinton's relationship with Madison Guaranty Savings and Loan Association, Whitewater Development Corporation, or Capital Management Services, Inc." Application for Appointment of Independent Counsel. The Attorney General who prescribed the original subject matter for investigation agrees. According to her amicus brief:

> [A]n offense cannot be "related" within the meaning of [the statute] solely because an independent counsel discovers it during a legitimate phase of his investigation. That interpretation of the statute would allow an independent counsel to prosecute offenses that bear no relationship to his original grant of jurisdiction.

Amicus Br. for United States at 32. "The current prosecution," the Attorney General concludes, "does not fall within [the Independent Counsel's] authority directly to investigate the Whitewater/Madison Guaranty matter." *Id.* at 34.

In reaching the opposite conclusion, this court rests its finding of "relatedness" on two assumptions: that the fees Hubbell received were payments for his silence, and that his failure to pay taxes on them had an obstructive effect on the Whitewater investigation. In my view, both assumptions are flawed, and each independently undermines the statutory and constitutional constraints on independent counsel jurisdiction.

### *Assumption of obstructive effect*

I begin with the court's second assumption, i.e., that Hubbell's failure to pay taxes on alleged hush money had an obstructive effect on the Whitewater investigation. Not limited to Hubbell's failure to pay taxes on alleged hush money, the indictment's sheer breadth belies the court's obstruction theory. The indictment charges Hubbell with non-payment of taxes on income from a book contract with HarpersCollins Publishers, early withdrawals from an IRA account and pension plan, and sales of his home and a

Little Rock warehouse. In addition, by charging Hubbell's lawyer and accountant for aiding and abetting tax evasion, the Independent Counsel did not limit the indictment to individuals who could have obstructed the Whitewater investigation.

According to my colleagues, "*any* criminal conduct that could hide the hush money ... tends to impede investigation and prosecution of the matter being hushed up." Maj. Op. at 561. "The less disclosure of the payments," they say, "the less chance that they and their nature will come to light...." *Id.* But even assuming that Hubbell's "consulting" fees were hush money (an assumption not supported by this record, *see infra* at 594–595), the facts of this case provide no support for the court's concealment theory. In his 1994 tax return, Hubbell actually *disclosed* $376,075 in "consulting" income that the Independent Counsel suspects is hush money. This amount included $100,000 from Hong Kong China Limited and $62,775 from Revlon, the two sources the court highlights, *see* Maj. Op. at 555 & n.1, en route to finding that "[t]he timing, sources, and extent of the payments make the belief that they were hush money reasonable," *id.* at 563. Acknowledging these disclosures, the court rests its finding of concealment on the fact that Hubbell did not report an additional $77,000 in "consulting" fees in 1994. *See* Maj. Op. at 561. But since Hubbell disclosed the lion's share of the alleged hush money on his 1994 tax return—including the very payments that the Independent Counsel and my colleagues believe have the strongest whiff of obstruction—it seems odd to think that Hubbell chose not to disclose the remaining fraction in order to conceal hush money payments. In any case, nothing in the record (beyond the non-disclosure itself) suggests that the $77,000 was hush money. *See infra* at 594–595. We thus lack any basis for suspecting that Hubbell's non-disclosure reflected a concerted effort to hide hush money instead of a general tendency (apparent from the indictment) to ignore the internal revenue laws.

The court's concealment theory makes much more sense in a case like *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976),

*cited in* Maj. Op. 561–562. There the defendants directly obstructed the Watergate investigation by lying under oath to the Special Prosecutor, a grand jury, and a Senate committee about hush money payments they had made to the Watergate burglars. *See* 559 F.2d at 59; *see also United States v. Blackley,* 167 F.3d 543, 548 (D.C.Cir.1999) (upholding conviction of high-ranking Department of Agriculture official who concealed payments he received from individuals regulated by the Department by failing to disclose those payments on an official financial disclosure form whose very purpose was "to bring suspicious influences to the surface").

The court next adopts the Independent Counsel's argument that Hubbell's failure to pay taxes "enhanc[ed] the financial or economic effect of the hush money payments. . . . And that contributes to the obstruction of the investigation." Oral Arg. Tr. at 16; *see* Maj. Op. at 561 ("[T]he more value Hubbell can squeeze from hush money . . . , the more chance it will succeed in preventing his cooperation."). But even if we again assume the payments to be hush money, their obstructive effect ended upon Hubbell's receipt; his subsequent nonpayment of taxes bought his benefactors no further silence. The Independent Counsel never alleged that Hubbell's benefactors somehow discounted the value of the alleged hush money by the probability that he would not pay taxes. Indeed, who could have foreseen the bizarre nature of the tax evasion scheme detailed in the indictment? Who would have expected that, having reported $376,075 of his $450,010 in "consulting" income on his 1994 tax return, Hubbell would then, as with his other income, not pay taxes on it?

The court's economic enhancement theory permits virtually unlimited expansion of the Independent Counsel's jurisdiction. Had Hubbell used the alleged hush money for profitable but illegal gambling or insider trading, for example, this theory would allow the Independent Counsel to indict him for these crimes simply because they increased the value of the money. Surely this result stretches the concept of "relatedness" beyond its statutory and constitutional breaking point.

Together, the concealment and economic enhancement theories enable the Independent Counsel to comb through all of Hubbell's investments and expenditures—including, as the indictment reveals, his purchase of clothes, groceries, and laundry services—until discovering some illegality on which to indict him. By adopting these theories, the court converts the Office of the Independent Counsel from a device for investigating a specific "subject matter," 28 U.S.C. § 593(b)(3), into a tool for prosecuting a specific individual. As the district court observed, "[t]he Madison–Whitewater matters that were the subject of the Original Grant and the tax matters that are the subject of this case have nothing in common—nothing, at least, that appears on this record—except Webster Hubbell." *United States v. Hubbell,* 11 F.Supp.2d 25, 32 (D.D.C.1998). This is precisely the result Justice Scalia, dissenting in *Morrison,* most feared:

> [T]he most dangerous power of the prosecutor [is] that he will pick people that he thinks he should get, rather than cases that need to be prosecuted. With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.

487 U.S. at 728, 108 S.Ct. 2597 (Scalia, J., dissenting) (quoting then-Attorney General Robert Jackson, The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys (April 1, 1940)) (quotation marks omitted).

Deeply corrosive to the statutory and constitutional limits on independent counsel jurisdiction, the court's concealment and economic enhancement theories cannot justify a finding of "relatedness" in this case. In my view, this conclusion in and of itself is enough to sustain the district court's quashing of the indictment. But because the court's contrary

holding also rests on the assumption that Hubbell's fees were hush money, I set forth my views on this issue as well.

### Assumption that Hubbell's fees were hush money

Even if the court's concealment and economic enhancement theories had merit, they have no applicability to this case for one simple reason: Both depend entirely upon Hubbell's involvement in an underlying crime of obstruction—a crime unsupported by any credible evidence in the record.

In his brief, the Independent Counsel refers to the "possibility" that Hubbell *"might* have accepted money as an inducement to obstruct the Madison investigation." OIC Br. at 20 (emphasis added); *see also id.* (stating that "large payments" on which Hubbell did not pay taxes *"may be* related to his non-cooperation with respect to Whitewater and Madison-related matters") (emphasis added). Yet the Independent Counsel has chosen not to indict Hubbell for accepting hush money payments or anyone else for making them. Although I agree with my colleagues that the Independent Counsel need not formally charge Hubbell for accepting hush money in order to indict him for tax evasion, I disagree that we may sustain the tax indictment simply because the Independent Counsel is "diligently pursuing his investigation of the main allegation that [hush] money was channeled to Hubbell," Wald Op. at 586. Without credible evidence that Hubbell accepted hush money, there can be no *"demonstrabl[e]* relat[ionship]" between Hubbell's tax crimes and the Independent Counsel's original grant of jurisdiction. *Morrison,* 487 U.S. at 679, 108 S.Ct. 2597 (emphasis added).

At oral argument, the Independent Counsel conceded that "we right now, as a matter of public record, don't know" that Hubbell's "consulting" income was hush money. Oral Arg. Tr. at 13. Notwithstanding this uncertainty, my colleagues have seen no need either to accept the Independent Counsel's offer to submit evidence *in camera*—evidence that he claims shows that the commission of that crime was more likely than not, *see id.*—or to remand to the district court to

consider such evidence. Instead, they accede to his request that we not "indulge in the assumption that there is no evidence of obstruction," *id.,* shoring up the Independent Counsel's innuendo with non-record evidence plus a little innuendo of their own, *see* Maj. Op. at 555 n.1.

The record in this case is quite unlike the record in *United States v. Haldeman,* where this court upheld the convictions of H.R. Haldeman, John Ehrlichman, and John Mitchell for "conceal[ing] a cover-up" in the Watergate affair. Maj. Op. at 562 (emphasis omitted). In that case, the allegations that the defendants paid hush money to the Watergate burglars and then lied about it under oath were supported by vast amounts of credible evidence, primarily consisting of direct testimony and tape recordings of key conversations among the co-conspirators. *See Haldeman,* 559 F.2d at 55–59 (describing defendants' "commitments" to pay the burglars hush money and detailing defendants' extensive conspiracy to raise, transfer, deliver, and conceal the hush money payments).

My colleagues say that independent counsel should enjoy the same discretion that U.S. Attorneys have to charge defendants with "cover-up" crimes without charging them for the underlying crimes. *See* Maj. Op. at 562 (citing Department of Justice guidelines). But as I have pointed out, Hubbell's tax offenses cannot plausibly be labeled "cover-up" crimes. *See supra* at 593–594. Moreover, the court's analogy is constitutionally flawed. It ignores the critical fact that U.S. Attorneys, unlike independent counsel, never need to prove that a particular crime falls within the jurisdiction ceded to them. They have authority to follow a trail of criminality and (subject to Justice Department procedures described below) to convert an investigation of real estate fraud into a prosecution of tax crimes. If the constitutional separation of powers precludes anything, it precludes the extension of such vast discretion to independent prosecutors who lack "the unifying influence of the Justice Department" and "the perspective that multiple responsibilities provide." 487 U.S. at 732, 108 S.Ct. 2597 (Scalia, J., dissenting).

## IV

Finally, in addition to adopting virtually limitless theories of "relatedness" and assuming that Hubbell accepted hush money, my colleagues discount the constitutionally significant requirement that independent counsel "comply with the written or other established policies of the Department of Justice respecting enforcement of the criminal laws" unless "to do so would be inconsistent with the purposes of the [Act]." 28 U.S.C. § 594(f)(1); *see Morrison,* 487 U.S. at 696, 108 S.Ct. 2597. Under Department of Justice Tax Division Directive 86–59, all federal prosecutors, expressly including independent counsel, must follow certain procedures before "seeking to expand nontax grand jury investigations to include inquiry into possible federal criminal tax violations." *Authority to Approve Grand Jury Expansion Requests to Include Federal Criminal Tax Violations,* 5 DEP'T OF JUSTICE MANUAL 6–227, 6–227 (1995–1 Supp.). This directive prevents prosecutors from targeting an individual for tax crimes when their investigative authority extends only to a non-tax criminal investigation. Specifically, it requires all prosecutors to submit written requests to officials at the Internal Revenue Service and Tax Division "containing pertinent information relating to the alleged federal tax offenses." *Id.* at 6–228. Approval requires an IRS referral certifying that "there is reason to believe that federal criminal tax violations have been committed." *Id.* at 6–229. In addition, prosecutors must conduct grand jury proceedings "in sufficient time to allow the results of the tax segment of the grand jury proceedings to be evaluated by the Internal Revenue Service and the Tax Division before undertaking to initiate criminal proceedings." *Id.*

In this case, I see no reason why the Independent Counsel could not have complied with Tax Directive 86–59. My colleagues are willing to *assume* that requiring such compliance would be "inconsistent with the purposes" of the independent counsel statute, 28 U.S.C. § 594(f)(1), attributing to the IRS—merely because it is an executive branch agency—a conflict of interest so severe that it cannot make a reasoned judgment as to whether Hubbell should be prose-

cuted for tax crimes. They apparently view compliance with Justice Department procedures as categorically "inconsistent with the purposes" of the statute whenever such procedures submit federal prosecutors to oversight by executive branch agencies. Surely section 594(f)(1) is not so toothless. This provision, which at the time of *Morrison* required compliance "except where not possible," 28 U.S.C. § 594(f) (Supp. V 1983) (amended 1994), was viewed by the Supreme Court as one of the statutory safeguards ensuring that the Executive Branch has enough control over independent counsel to accomplish its constitutionally assigned functions. *See Morrison,* 487 U.S. at 696, 108 S.Ct. 2597.

## V

In sum, I believe that the court's finding of "relatedness"—premised on deference to the Special Division, unbounded theories of obstruction of justice, and unsubstantiated suspicions of illegality—undermines the constitutional constraints on independent counsel jurisdiction. *Morrison* endowed the statute's jurisdictional controls with constitutional significance because it recognized that the absence of such controls would enable independent counsel to usurp executive power. This case provides reason to worry that the Office of the Independent Counsel indeed functions as a "mini-Executive ... operating in an area where so little is law and so much is discretion." *Morrison,* 487 U.S. at 732, 108 S.Ct. 2597 (Scalia, J., dissenting). Because the constitutional separation of powers demands greater vigilance, I conclude that this Independent Counsel has exceeded his jurisdiction.

My conclusion would not impair the Ethics in Government Act's "central purpose ... [of] permit[ting] the effective investigation and prosecution of high level government and campaign officials," *United States v. Wilson,* 26 F.3d 142, 148 (D.C.Cir.1994), *quoted in* Maj. Op. at 560–561. This Independent Counsel's original grant gives him all the authority he needs to prosecute Hubbell and others for obstruction of justice if he has evidence that Hubbell received hush money. *See* 28 U.S.C. § 593(b)(3). If he wants to prosecute Hubbell for self-standing tax of-

fenses discovered in the course of his investigation, he can ask the Attorney General to expand his investigative jurisdiction, *see id.* § 593(c), and then set in motion Justice Department procedures for prosecuting criminal tax violations, *see supra* at 562. As the subsequent indictment of Hubbell illustrates, *see* Neil A. Lewis, *Starr Indicts Hubbell a 3d Time,* N.Y. TIMES, Nov. 14, 1998, at A1, the Independent Counsel, short of pursuing this tax indictment, retains vast investigative and prosecutorial authority under the Special Division's January 1998 referral.

I respectfully dissent.

WILLIAMS, *Circuit Judge,* dissenting from Part II:

The commentator who predicted that *Fisher* and *Doe* would "inevitably lead" to "metaphysical speculation" was apparently all too prescient. See Samuel A. Alito, Jr., "Documents and the Privilege Against Self-Incrimination," 48 U. Pitt. L.Rev. 27, 59 (1986). The majority opinion supplies some such speculation and demands more from the district court on remand. I would limit the district court's inquiry about the subpoenaed documents to verifying that the Independent Counsel, in securing Hubbell's indictment, has only used information that he would have had if the documents had appeared in his office, unsolicited and without explanation.

\* \* \*

It is clear that a prosecutor who has obtained personal documents by subpoena may not, without violating either the Fifth Amendment or a use immunity of equivalent scope granted under 18 U.S.C. § 6002, use against the subpoenaed person any testimonial, incriminating information that is communicated by that person's "act of production" of the documents. See *Doe v. United States,* 487 U.S. 201, 209, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988) (*"Doe II"*). The Supreme Court identified three species of information possibly communicated by such an act of production—possession, authentication and existence. See *id.*

Here the only interesting issue is the "existence" theory; possession and authentication seem properly outside the case. Hubbell's prior possession is irrelevant if, as appears to be the case, the Independent Counsel relied on the documents only for the information that they contain, and thus had no occasion to rely on Hubbell's act of production, or anything else, for evidence that Hubbell at one time had "possessed" them. Nor does it appear that he used the production for authentication; he never sought to show the grand jury that Hubbell, by delivering the documents in response to the subpoena, had identified them as being ones that matched the descriptive language of the subpoena.

Thus we are left with "existence." From the truism that the Independent Counsel could not use the contents of the documents unless they (at some time) existed, and unless he learned of that existence, the majority leaps to the proposition that the Independent Counsel's awareness of their existence stems from *a testimonial aspect* of Hubbell's act of production. Accordingly, it says, the Independent Counsel may use the information in the documents if but only if he can show that he possessed, *before* securing the subpoena, a knowledge of the documents' existence sufficiently detailed that his later knowledge, *after* their delivery, was a "foregone conclusion."

But not all aspects of the act of production are testimonial. Where an item of information that the prosecutor receives from a document delivery flows from a non-testimonial aspect, he does not depend on any testimonial aspect. Information as to the existence of the pieces of paper turned over by a subpoenaed party can always be traced to non-testimonial information. I elaborate below.

\* \* \*

*"Testimonial."* Before the *Fisher* Court introduced the "foregone conclusion" discussion on which the majority is so focused—and which I discuss below—it observed that the whole issue of whether something is "testimonial" depends on the facts and circumstances. *Fisher v. United States,* 425 U.S. 391, 410, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). But what facts and circumstances are relevant?

One possibility might be that all actions from which we can glean information are considered testimonial communications for purposes of Fifth Amendment analysis. But the precedents upon which *Fisher* relied in more or less rejecting the view of *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), that the Fifth Amendment protects the contents of subpoenaed documents, appear to rule this out. Those cases involve the government forcing a person to try on a blouse worn by the perpetrator to establish whether it fit the defendant, *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), or to give blood samples, *Schmerber v. California,* 384 U.S. 757, 764–65, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), voice samples, *United States v. Wade,* 388 U.S. 218, 222–23, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), or handwriting samples, *Gilbert v. California,* 388 U.S. 263, 266–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). They do not rely on anything like the "foregone conclusion" rationale; instead, they find that such acts are not testimonial because they fit into the category of "compulsion which makes a suspect or accused the source of 'real or physical evidence.'" *Schmerber,* 384 U.S. at 764, 86 S.Ct. 1826.

Nor can these cases be recharacterized as ones where the prosecutor's grasp of the information obtained was a foregone conclusion. Of course it is true that, for example, it is typically not much to admit that one can speak. But in giving a voice sample, one also admits that one's voice has various characteristic idiosyncrasies—a non-obvious and incriminating fact that the law allows the prosecutor to secure by compulsion. The prosecutor's and jury's access to that information is as dependent on the speaker's compelled implicit admission of ability to speak as their access to the information on documents is dependent on the subpoenaed party's implicit admission of the documents' existence.

One can, of course, discern a communicative element in the giving of a voice sample: a person commanded to speak implicitly says, "This is the way I sound when I speak." But that information adds nothing to what a jury learns from its own ears (or from a properly authenticated tape, if that is the way it is done, see, e.g., *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (grand jury subpoena requiring suspects to read transcripts into a recording device is consistent with Fifth Amendment)). Similarly, a person giving a blood sample implicitly says, "This is my blood." Though there is implicit communication, the prosecutor need not rely on it, so long as he has the blood and a witness to the blood-giving itself.

*"Foregone Conclusion."* The most confusing part of *Fisher* is the language that the courts have taken to tie "foregone conclusion" closely to the "testimonial" analysis and vice versa. 425 U.S. at 411, 96 S.Ct. 1569. The Court said: "Surely the Government is in no way relying on the 'truthtelling' of the taxpayer to prove the existence of or his access to the documents. The existence and location of the papers are a foregone conclusion...." *Id.* (citation omitted). In my view, the latter sentence should be read in light of the former. That is, "foregone conclusion" is only a subset of the broader set: instances where sources independent of testimonial aspects of the compulsion fully account for the prosecutor's evidence.

This relationship is illustrated in an example used in *Fisher*: "When an accused is required to submit a handwriting exemplar he admits his ability to write and impliedly asserts that the exemplar is his writing. But in common experience, the first would be a near truism and the latter self-evident." *Id.* The Court here is implicitly referring to *Gilbert v. California,* 388 U.S. at 265–67, 87 S.Ct. 1951, one of the cases it had just relied upon in more or less overruling *Boyd.* In *Gilbert,* the police got the suspect to write out some handwriting exemplars while he was in custody and being questioned. When the Court calls the implicit admission of ability to write a "near-truism," the "near" is critical. Consider a kidnapping, in which a ransom note is a major piece of evidence, but the suspect claims illiteracy. Suppose police, posing as terrorists, frightened him into writing something (the text of which had no bearing on the kidnapping). There might be some sort of due process argument, but in using the handwriting sample the prosecutor

would not need to rely on any implicit testimonial aspect of the scenario ("Yes, I do know how to write."); accordingly he could use the sample without violation of the defendant's privilege against self-incrimination.

More important is the defendant's implicit admission that the exemplars are his. This is not, strictly speaking, "self-evident"; rather, it is supported by evidence (the testimony of the witnessing police officers) of a non-testimonial aspect of the act of production, here the act of writing. But as the Court says, the government is "in no way relying on the 'truthtelling' of [defendant]" to prove anything: it is relying only on the immediate personal observations of the policemen and on nontestimonial aspects of the defendant's act to link the handwriting to the defendant. Everything else of evidentiary value, namely the idiosyncrasies of the writing, depends only on the writing itself. As we'll see more explicitly below, this matches the relation of a prosecutor to documents delivered pursuant to subpoena. The information *on* the documents stands or falls on its own value, even though (by definition) produced by the defendant's act of production. Thus: for handwriting, the link to the defendant is established by police witnesses and the testimonial value of the defendant's act of production is redundant; for documentary information, so long as the prosecutor depends as here only on information in the documents themselves for the link to defendant, the communicative aspect of the act of delivery is equally redundant.

*Existence.* In light of the above, the only sense of "existence" that is covered by the Fifth Amendment is that which refers back to the subpoena. The responsiveness of the documents to the subpoena gives knowledge of "the existence of the papers *demanded,*" 425 U.S. at 410, 96 S.Ct. 1569 (emphasis added). "Yes, these are the records you described in the subpoena." If the government could refer back to the subpoena to identify documents and to clarify relationships that were not clear on their face or by other independent means, then it would be using a testimonial component of the transaction—the witness's implicit statement that the documents match the subpoena's descrip-

tion. Hubbell's claim for blanket exclusion of the contents, by contrast, relies on existence in a quite different sense—the fact that these particular pieces of paper are in being. But this is quite easily confirmed by these papers' own physical presence, which is "self-evident" at the time and place of production and so long thereafter as the government maintains proper custody. Existence in that sense is as "self-evident" as the blood and its characteristics in *Schmerber,* the voice samples and their characteristics in *Wade,* and the handwriting and its characteristics in *Gilbert.*

Some of the language in *Fisher* and *Doe,* to be sure, suggests a more sweeping view of "existence." *Fisher* I have discussed above. *Doe* upholds a decision quashing certain subpoenas, based on trial court findings (endorsed by the court of appeals) that delivery of the documents gave the prosecutor previously absent knowledge of their existence, possession, and authenticity. See *United States v. Doe,* 465 U.S. 605, 613–14 & nn.11–13, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). But the implications are quite unclear. The Court relied explicitly and entirely on the "two courts" rule. *Id.* While the majority argues that the findings below were structurally applications of law to fact, see Maj. at 570 n.24, the Court's treatment of them was as simple fact. Second, to the extent that its rehearsing of the arguments embraced in the courts below may suggest the sort of "existence" theory employed by the majority, the inference is drawn in question by the Court's reliance on the anticipated use of the act of production for authentication of the documents, i.e., use of an indisputably testimonial aspect of subpoena compliance. See 465 U.S. at 614 n. 13, 104 S.Ct. 1237.

Accordingly, the logic of *Fisher* and *Doe,* if not every phrase, clearly supports the prosecutor's right to use information from subpoenaed documents regardless of whether he was previously able to describe them. The particular documents' existence speaks for itself once they have been delivered; so long as his use of them is independent of any *testimonial* aspects of the witness's act of

production, that use is consistent with the witness's Fifth Amendment privilege.

\* \* \*

The majority confuses the issue with a rather odd distinction: if compulsion "acts upon, and requires the exercise of an individual's mental faculties for communication," it is testimonial; if it "merely utilizes the body of the accused as a form of evidence," it is not. Maj. at 572–573.

To the extent that the majority here acknowledges that the bare physical aspects of a production—the meanings that are directly apparent to the senses—are unprotected by the Fifth Amendment, it is correct. But there is no reason to restrict this to the "body of the accused."

In fact, the majority fails to explain the cases that fall outside this apparent restriction. *Gilbert v. California*, approvingly cited by the majority, concerned a handwriting sample that the suspect had to write out and then turn over to the police. But more telling is *Baltimore Dept. of Social Servs. v. Bouknight*, 493 U.S. 549, 554–55, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990). In that case, a woman was ordered to turn over a child whom she was believed to have abused and who was last seen in her custody. The Court held, among other things, that the woman "cannot claim the privilege based upon anything that examination of [the child] might reveal."

Thus in *Bouknight* it was not the body of the *accused* that was used as a form of evidence, but the body of *another*. Documents are exactly analogous: physical objects the examination of which yields evidentiary value or clues. Documents do, of course, represent the concrete embodiment of mental activity, but that is a false lead: these thoughts (the contents of the documents) were, we assume, put to paper quite voluntarily—if they were not, they would unquestionably be protected. See *Doe I*, 465 U.S. at 610–11, 104 S.Ct. 1237. In *Bouknight* the Court was obviously indifferent to the necessity that the suspect find and turn over a child whose location was completely unknown to the government; the court here

should be equally indifferent to the necessity that Hubbell do the same for documents.

Delivery of the child in *Bouknight* clearly depended on the suspect's exercise of her mental faculties; in fact, her intellectual efforts turning up the child were no less then they would have been had the government known its whereabouts in advance. The case thus flatly contradicts the majority idea that self-incrimination occurs whenever the subpoena "requires the exercise of an individual's mental faculties." The majority might say, with internal consistency though not with conformity to the cases, that the government may use the product of forced mental exercise so long the mental exercise is no more than an automaton's execution of intellection already carried out by the government. But that would take it to the position that a document subpoena must *itself* set forth whatever descriptive detail is necessary (under the majority's murky test) about the documents' character and location. Even the majority evidently recoils at this absurdity.

There are of course non-physical aspects to the production in *Bouknight*. In another part of that opinion, the Court used a different analysis for the suspect's "implicit communication of control over [the child] at the moment of production," 493 U.S. at 555, 110 S.Ct. 900, saying that although this was arguably an incriminating "testimonial assertion," *see id.*, some uses of it might be permissible under the doctrine that the Fifth Amendment may not be invoked to resist compliance with certain types of regulatory regimes, *id.* at 555–62, 110 S.Ct. 900. Here, of course, the government has no interest in Hubbell's control of the documents at the moment of production, and seeks to draw no inferences from that control. But the majority's concern here with information about the documents *before* their delivery is utterly different from the *Bouknight* Court's focus on "the moment of production."

\* \* \*

The majority's confusion is further evident in its attempt to draw some distinction between whether something is "testimonial" and whether it has "testimonial value." See Maj. at 574 n.27, 576 n.31. This dissent, the

majority argues, wrongly frames the former rather than the latter issue as the key. Putting aside such issues as whether this terminological difference makes sense—if something is not "testimonial," its "testimonial value" is obviously zero—or is to be found in the cases—*Fisher*, for example, simply refers to "the more difficult issue[ ]" of "whether the tacit averments ... are [ ] testimonial," 425 U.S. at 410, 96 S.Ct. 1569—the actual analysis endorsed by the majority is not much different from the analysis in the "Foregone Conclusion" section above. The majority writes:

> Where the government need not rely upon the truthtelling of the witness, *because it has prior knowledge of the information that will be communicated through the act of production,* 'no constitutional rights are touched.'

Maj. at 576 n.31 (emphasis added) (quoting *Fisher*). The only disagreement here is the italicized portion: for some reason, the majority believes that possession of "prior knowledge" is the only circumstance in which the government "need not rely upon the truthtelling of the witness." But the majority never explains how, under its theory, there is no testimonial self-incrimination if the government need not rely because it already knows, while there *is* testimonial self-incrimination if the government has another reason for dispensing with reliance on communicative aspects of the witness's acts. Nor could any such explanation be consistent with precedent. In *Bouknight*, which concerned a subpoena to turn over a missing child, the Court found that the target could not "assert the privilege upon the theory that compliance would assert that the child produced is in fact [the child sought]" because that fact was one "the State could readily establish," 493 U.S. at 555, 110 S.Ct. 900, despite the .fact that the government *could not* have made such a finding until *after* the production.[1] Here, too, the government need not rely on any communicative or testimonial aspect of Hubbell's act of production; once it

acquired the documents, their intrinsic value evidently served its purposes quite adequately. The majority imposes a wholly artificial and impermissible limitation on the reasons for which the government "need not rely" on testimonial implications of the act of production.

\* \* \*

For a district judge, the challenge of the majority's view is to determine the "quantum" of relative prosecutorial ignorance that triggers a self-incrimination violation. Prosecutors know that businessmen keep business records (just as they know that living humans have blood and literate persons have handwriting); this is plainly too little information for the majority. But evidently the prosecutor need not have advance knowledge of the details that he is interested in. See Maj. at 580. Somewhere in that range is an imaginary line which, unlike the equator, can never be fixed or defined with clarity. Henceforth, therefore, the operational meaning of the "act of production" doctrine in our circuit will largely turn on district courts' discretion in this metaphysical classification of prosecutors' knowledge.

Though recognizing that no other court has applied its mind/body distinction explicitly, the majority claims that the existing lower-court cases can be lined up to fit. If so, this seems to me only because the factual detail of the cases is so skimpy and the majority's test so elastic. And to the extent that the cases *can* fairly be viewed as embracing the majority's readiness to squeeze production immunity into a simple "foregone conclusion" analysis, they miss the point. "Foregone conclusion" is just one species of one part of the doctrinal structure the Supreme Court has set out; the majority's obsession with that phrase diverts its focus from the key issue, the presence (or absence) of "testimonial" incrimination.

Let us return to blood and handwriting, the contexts for the key decisions underlying

---

1. The majority appears to believe that this fact—the match of the child produced to the child sought—was a "foregone conclusion" because "presumably his social worker could testify as to his identity." Maj. at 574 n.27. This indicates either that the majority's definition of "foregone conclusion" includes things that only become

apparent *after* the production itself—in which case the majority has no reason to disagree with this opinion—or that the majority believes that there is some way in which one can "readily establish" the identity of a person or thing that cannot yet be inspected.

*Fisher.* Of course live humans have blood; of course literate humans have handwriting. These propositions are virtually true by definition. But the interesting data from blood and handwriting samples—blood type, DNA information, handwriting idiosyncrasies—are characteristically unknown to the government in advance. The admissibility of these data stems not from the government's advance knowledge of the obvious, but from two propositions: (1) the critical information extracted from the witness (DNA and blood type, handwriting idiosyncrasies) is non-testimonial in character, see *Fisher,* 425 U.S. at 409, 96 S.Ct. 1569, and (2) the prosecutor's knowledge of the link between the witness, on the one hand, and the blood and the handwriting, on the other, is independent of the communications that are implicit in the witness's giving blood or handwriting. Here, similarly, the documents' informational content (the equivalent of the DNA, etc.) is non-testimonial in character, and the Independent Counsel is interested in the documents' link to the witness *only* insofar as it is shown by the contents of the documents.

\* \* \*

Sensibly construed, the act of production doctrine shields the witness from the use of any information (resulting from his subpoena response) beyond what the prosecutor would receive if the documents appeared in the grand jury room or in his office unsolicited and unmarked, like manna from heaven. See DOJ Amicus Br. at 42; Alito, *supra,* at 59–60. The prosecutor would in such a case not be able to identify, verify someone's control over, or authenticate the documents except to the extent their own contents—or other sources—did so. He would thus make no use of any testimonial aspect of the act of production. Yet, like DNA and handwriting idiosyncrasies, the contents would themselves be unprotected, except to the extent that deciphering might depend on the context of the subpoena—the information conveyed by the suspect's implicit matching of them with the subpoena description.

This distinction between contents and production is apparently missed by the majority. Its first hypothetical of the murder weapon claims that this "manna from heaven" theory would allow the government to compel a suspect "to incriminate himself verbally" by revealing the location of the murder weapon. But in the majority's hypo, the weapon is obviously the fruit of poisoned testimony: a revelation under compulsion. A more apt instance would be if a suspect had previously—without compulsion—written down the location in his day planner, and the government subpoenaed the planner. The production of the day planner, like the production of a missing child, is compulsory but non-testimonial. The much more harmful contents are obviously testimonial, but they are not the fruit of any unlawful compulsion (so long as the government's use is independent of the context of the subpoena).[2]

On remand the only question should be whether the Independent Counsel complied with the limits set by the above principle. Accordingly, I dissent on this issue.

---

**2.** The majority's second hypothetical, see Maj. at 584–585, is too imprecise to bear much analysis, but if it posits that the government in fact relies upon the communication implicit in the defendant's delivery of the murder weapon to link it to him, then that weapon must of course be excluded. Moreover, the hypothetical subpoena might well be invalid for being "unreasonable or oppressive," Fed.R.Crim.P. 17(c)—a defect unrelated to self-incrimination.